## Jonash v. Jonash, Appellant.

Argued November 13, 1962. Before RHODES, P. J., ERVIN, WRIGHT, WATKINS, MONTGOMERY, and FLOOD, JJ. (WOODSIDE, J., absent).

*John J. McLean, Jr.,* with him *Spinelli & McLean,* for appellant.

*Alexander L. McNaugher,* with him *Taylor, Mc-Naugher & Duerring,* for appellee.

OPINION BY ERVIN, J., December 12, 1962:

The plaintiff, Carl M. Jonash, filed a complaint in divorce a.v.m. on the ground of indignities. The testimony was taken before the Honorable HENRY X. O'BRIEN, then a judge of the Court of Common Pleas of Allegheny County. Before Judge O'BRIEN decided the case he was elevated to the Supreme Court of Pennsylvania. Pursuant to a stipulation then filed by counsel, the case was referred to the Honorable RALPH H. SMITH, JR. to be decided on the transcribed record. Judge SMITH entered a decree in divorce in favor of the plaintiff-husband and the defendant-wife has taken this appeal.

The parties were married on June 25, 1936, at Wellsburg, West Virginia, and took up residence in the home of the wife's mother at 218 Mary Street, Munhall, Pennsylvania. There they resided until the husband left home on or about May 5, 1959. The parties have two daughters, Ruth Ann, born September 16, 1937, and Elaine, born February 17, 1939. An order of support in the sum of $80.00 a month has been made by the County Court of Allegheny County for the support of the wife.

The husband's case rested solely upon his own testimony, which was directly contradicted by the testimony of the wife. The two daughters, who are now

grown and self-supporting, corroborated their mother's testimony in a number of instances.

The husband testified that the wife refused to move into a separate home as requested by the husband. The husband testified that at different times he asked his wife to move into a home of their own but that she refused to do so. The husband did not indicate any specific home. The wife testified that after the first baby was born in 1937 her husband asked her to move to a separate home but that she refused to do so because he wasn't making enough money to support a separate home. She testified that at that time he was making approximately $15.00 a week. She said he never thereafter suggested they move to a different home. After this offer was made the parties continued to reside together for more than 20 years in the home of her mother and it would appear to us that the husband's offer was certainly not a very serious one. Under the circumstances we do not believe that this constituted an indignity.

The second indignity alleged by the husband is that he was obliged to sleep in a separate bedroom from 1939 to 1959. The wife testified that she "had to leave the bedroom three months before I had the youngest child because he would not let me alone." She testified that because of her condition the doctor had advised both the parties that they should not have any intercourse; that her husband disregarded the advice and would not let her alone. She also testified that the doctor advised corrective surgery after the birth of the first child as soon as she got strong enough to have the same; that the husband, notwithstanding the doctor's advice, continued to have relations with her and that she became pregnant a second time before she could have the operation.

The wife also testified that after the first six months of the marriage, her husband's conduct and habits

changed and that he would come home drunk around 3:30 in the morning almost every night. The husband admitted that after he finished working in a gas station at eleven o'clock at night he would stop in a taproom and drink beer and eat sandwiches. The wife testified that she had to remain up to let him in the back door and that she tried to get her husband to change his way of living but that he would not do so. She also testified that he used foul language and talked so loud that the neighbors could hear him when the windows were open. It seems to us that the wife was justified in refusing to sleep with her husband under these conditions.

The husband also complained that the bedroom was cold and that he did not have enough blankets to keep warm. The wife testified that the bedroom, which was located over the kitchen, contained a register in the floor and that if the door were left open heat would come up the stairs from the kitchen. She also stated that he had plenty of bed clothing.

The husband testified that his room was dirty and unkempt and that his sheets and pillowcases were not kept clean. The wife testified that she and her daughter cleaned the room each week, usually on Saturday, and that his shirts, clothing, sheets and pillowcases were sent to the laundry each week. The daughters corroborated the mother as to this testimony. The daughters also corroborated the mother as to the condition in which their father would come home each night.

The husband also complained of the fact that the wife never ate any of her meals with him. The wife did prepare his lunch and dinner each day. She also prepared breakfast for him but he would not eat it because he didn't like oatmeal. The husband worked as a laborer for the Borough of Munhall from 8:00 a.m. to 4:30 p.m. He then came home and wanted his

meal served at that time so he could be back to work at a gas station at 6:00 p.m., where he worked until 11:00 p.m. This he did every day of the week except Sunday and he worked in the gas station on Sunday. The only reason why he could not eat his meals with his wife and the rest of the family was because his work would not permit him to do so. The wife testified that he wanted his dinner early. She also stated that she sat with him a number of times when he ate his dinner.

The husband also complained that he was not permitted to use the bathroom in the home and was furnished a "slop jar" for his own use. He said that the wife did not empty the "slop jar." The wife denied this and testified that she did empty the "slop jar." She also testified that he was not denied the use of the bathroom except when they had company, which was infrequently. In order to get to the bathroom from the husband's bedroom, it was necessary to go through another bedroom where the company slept. The wife did not think it would be proper for him to go through there when that bedroom was occupied by the company.

The husband also complained that the wife turned the two daughters against him. The daughters testified that the mother did no such thing but that their father himself turned them against him. We can well understand that if this man came home in the early hours of the morning in an intoxicated condition night after night and used foul language so that the neighbors could hear him, the daughters would turn against him.

The husband also complained that there was a hole in the roof in his bedroom which permitted birds to come in and dirty his room. The wife denied that there was a hole in the roof and said that the roof was comparatively new. She also testified that the husband left the window open without putting in a screen, and this was her explanation for the presence of the birds.

The husband produced pictures which he took of the bedroom and did not produce any to show the hole in the roof. Certainly he could have corroborated his testimony as to this if it were a fact.

The wife described the husband's leaving on or about May 5, 1959 as follows: "Well, there were no words, no arguments of any kind. It was a surprise to me. I wasn't even looking for it. I had prepared his supper, and when he came in he sat down and I put it on the table and he didn't just—well, you couldn't say he really ate his supper because he just pushed it around over the plate, and he told me that I didn't need to bother waiting up, I didn't need to bother packing him any lunch, that he was getting the hell out and he had gotten himself a room. And I asked him, I said, 'You don't mean that?' and he said, 'Yes, I do.' "

The husband also admitted that he was keeping company with another woman just prior to his departure from the home. He admitted that after he would quit work at the gas station, he would go for a drive with this woman, who was a taxicab driver. We cannot believe that he went out with this woman at that hour of the night just to see the scenery.

We have carefully read the entire record and we conclude that the evidence of the plaintiff is fully contradicted by the evidence of the defendant and that in many particulars the two daughters of the parties corroborated the mother.

"A decree may be supported by the testimony of the plaintiff alone. Where, however, the testimony of the plaintiff alone is contradicted and shaken by the defendant and where there are no convincing circumstances warranting a disregard of the contradictory evidence, a case has not been made out: . . . ." *Lombard v. Lombard*, 194 Pa. Superior Ct. 162, 164, 166 A. 2d 98. See also *Dello Buono v. Dello Buono*, 193 Pa.

Superior Ct. 118, 163 A. 2d 662; *Fitelson v. Fitelson,* 189 Pa. Superior Ct. 366, 150 A. 2d 389.

We are convinced that the husband has failed to meet the burden which the law places upon him of establishing a case of indignities to the person.

The husband did not offer any rebuttal testimony to deny or contradict the testimony of his wife and daughters concerning his late hours and drunkenness and his dating of the woman taxicab driver, whose name was Henrietta. We are also convinced that this husband was not an injured and innocent spouse and in a case where the husband seeks a divorce on the ground of indignities, he also has the duty of showing that he was an innocent and injured spouse: *Matovcik v. Matovcik,* 173 Pa. Superior Ct. 267, 270, 98 A. 2d 238; *Lombard v. Lombard,* supra, at p. 167.

Decree reversed.