ANTHONY VERNON, JR. ALIAS RONALD VERNON COWAN *v.* STATE OF MARYLAND

[No. 665, September Term, 1970.]

*Decided June 28, 1971.*

---

The cause was submitted on briefs to MORTON, ORTH and GILBERT, JJ.

Submitted by *Thomas J. Aversa, Jr.,* for appellant.

Submitted by *Francis B. Burch, Attorney General, James G. Klair, Assistant Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Anton J. S. Keating, Assistant State's Attorney for Baltimore City,* for appellee.

ORTH, J., delivered the opinion of the Court.

Anthony Vernon, Jr., alias Ronald Vernon Cowan,[1] was convicted at a bench trial held in the Criminal Court of Baltimore on 5 and 6 October 1970 of robbing and assaulting Ramolo DiBlasio on 9 February 1970. He claims error in the admission of a judicial and extrajudicial identification of him as the criminal agent and questions the sufficiency of the evidence to sustain the convictions.

DiBlasio, the owner of the Fleet Furniture Company, was alone in his place of business at 1736 Fleet Street in Baltimore City about 2:00 P.M. on 9 February 1970 when two men came in. He saw two other men outside the store.[2] The two in the store indicated that one of them wished to buy furniture and both looked around.

---

1. The name in the indictment was Anthony Vernon otherwise called Anthony Vernon Cowan. Upon arraignment appellant told the court that his "birthright name" was Ronald Vernon Cowan and his alias was Anthony Vernon, Jr. The indictment was so amended without objection.

2. Appellant was jointly indicted with Thomas Lee Williams, Ronnie Boone, McArthur Robinson, William Martin Roundtree and Michael Allen Jones. Williams, Boone, Roundtree and Jones were convicted of the robbery under a plea of guilty. Robinson was found guilty of robbery at a bench trial.

A selection was made and an order written when the prospective buyer said he wanted the bedroom set in the back part of the store. They went back and the man said a drawer was loose. "So, I looked at it, and I says, 'Well, I can't do anything about that.' And I turned around and walked away from him. And before I took a couple of steps, he — this fellow came up from behind me and grabbed me around the throat with his arm, an arm-lock — whatever they call it—and brought me down to the ground, to the floor, and proceeded to choke me very strongly. * * * He had his arm around my neck — throat. So, he had me for, I don't know, a long time, and I couldn't say anything. I was only able to gasp for air. So, I was able to sort of roll around and get his arm from my throat, and I says, 'Let me go.' And he just, you know, kept his arm tightened around. And the other man I couldn't swear that he was on me, but this one had me down good. So then I says—well, I says, 'I don't have any money.' I says, 'You can search.' I says, 'The only thing I have is a check that came in from the finance company that morning for five hundred dollars.' I says, 'It's in the desk drawer.' I says, 'Go ahead and take it.' So, not saying a word — I mean, he just kept choking me, and then I felt them turning me over. They had me down on the floor, and they were dragging me back, these two men — one was dragging, one was pushing. I could feel that. * * * So, they did manage to push and drag me back to another little partition in the back of the store, and I, then, was able to observe three pair of shoes all around me. And they just weren't saying anything. And the one did say, 'Shut up, shut up.' And they proceeded to tie me up. And one I did see as I turned from the floor, face down. * * * Well, I couldn't tell [what they tied me up with] but after it was over with, there was a piece of old television cable — wire — and one wanted to put a handkerchief in my mouth, and I felt blows, and I did see those furniture legs — there was one leg that was that long — I observed that in one man's hand (indicating) [about 12 inches]. * * * And,

then, I also observed at another point one short, heavy leg that is — that is not a furniture leg. * * * I would say it's about six inches long and about three inches around, which was unusually heavy for a furniture leg of that type. So, they were saying, 'Shut up, put your hands up.' I says, 'I can't.' So, finally, I was able to get my hands out into the back where they wanted to tie me up. So, then, at that point, I felt that I was being released, and I saw two pair of feet go up the rear steps, which 1 was about four feet from the steps where they had me down on the floor. * * * Well, then, I was able to roll over on my back, and one man that had not been in the store — one of the first two — he came from the sidewalk, evidently, and he opened a knife and put it to my throat, and he said, 'If you say anything, I'll shove this right in.' * * * Well, I would say it was a long knife like that — the man did open it. * * * But, there was a knife against my throat that was opened up, pulled from the pocket and opened up. * * * He said, 'If you say anything, I'll shove this right in. * * * He went up the steps. * * * Those same rear steps that only lead to the second floor. * * * I was, then, able to stand up, and I started to exit from that little room in the back, through the doorway, leading into the main part of the store, when I noticed a police officer, and I don't know whether I approached — whether I said the first words, or he asked me, 'Does this man work here?' He had a man down at the door. I said, 'Nobody works here but myself.' I says, 'There's nobody supposed to be in this store but myself." Twenty-five dollars was stolen from his person. DiBlasio was unable to make a judicial identification of any of the men he saw during the robbery.

Joseph Borzymowski was double-parked on Aliceanna Street near Broadway about a block and a half from 1736 Fleet Street about 2:00 P.M. on 9 February 1970. A car bearing a District of Columbia license tag pulled around him and parked by the curb about 40 feet in front of him. Five men were in it. Four got out and scattered —went in different directions; the driver remained in the

car. Two of the men went up Regester Street and one went up Aliceanna Street to Ann Street by himself but followed by the fourth man. Borzymowski followed in his car and saw the man who went to Ann Street turn into Fleet Street. Borzymowski did not then turn into Fleet Street but circled around and came down Fleet Street in the opposite direction. He saw a man standing in the doorway next to the furniture store and another looking in the window. He said to himself: "They are holding up the furniture store," gave "the gas to the car," drove to a telephone booth at Broadway and Fleet Street, called police and told them there was a holdup in progress. He identified a car in a photograph shown him as the car he had seen. He made a positive judicial identification of appellant as one of the men he had seen in the car and as one of the two who went up Aliceanna Street then north on Ann Street, west on Fleet Street, stopped at the furniture store, and stood outside the doorway, looking up and down. Appellant had on white tennis shoes and dark glasses. Borzymowski later that day viewed a lineup at Central Police Station. The court asked if appellant raised a question as to the presence of counsel at the lineup and was told that he did. Borzymowski was temporarily removed from the stand so the State could adduce evidence as to the lineup.

Officer James McCloskey of the Baltimore City Police Department was present at a lineup held about 7:00 P.M. on 9 February 1970 at Central Police Station. Appellant was in the lineup. Over fifteen people viewed the lineup —"there was six suspects we had, plus there was three other suspects that they had for some of the holdups in the city and county." He identified the lineup sheet. It showed that 9 men were in the lineup and that it was viewed by twenty-five persons. Joseph Borzymowski and Annetta Borzymowski, his wife, made a positive identification of appellant.[3] The sheet bore the notation "Att.

---

3. In addition to appellant Mr. Borzymowski identified Boone, Robinson, Williams and a Robert Edwards and Mrs. Borzymowski identified Robinson and Williams.

Martin B. Levinson present during Line up." McCloskey said the lineup had started, then counsel came in. Mr. and Mrs. Borzymowski were the twenty-third and twenty-fourth persons to view it and counsel was present at that time. On cross-examination by defense counsel Levinson, McCloskey reiterated that the attorney made his appearance during the lineup but he could not say when the attorney left.

Appellant testified on the issue of the lineup. He said he was arrested about 3:00 P.M. on 9 February, taken to the police station, advised of his rights and remained silent. After 6:00 P.M. he was permitted to call his lawyer, Jack Cweiber, who said he would send someone down. An officer had told appellant a lineup would be conducted. He said he was in the lineup quite a while — 15 or 20 minutes after it started—before he heard Levinson call out "Anthony, I'm here."

Levinson took the witness stand. He said he had been requested by an associate, Morton Edelstein, to be at the lineup. He picked up the call from his answering service about 7:00 or 7:30 P.M. and arrived at Central probably about 7:30 quarter to 8:00 to represent appellant at the lineup. He saw appellant in the No. 1 position. He had information about another offense allegedly involving appellant which had been committed in Baltimore County. Appellant was identified by someone with respect to the Baltimore County offense.[4] Levinson talked to this witness, saying "Well, it's pretty difficult to pick somebody out in this type of room, isn't it." The witness did not know that Levinson was a lawyer and said, "Yes, can't be too sure." Levinson testified: "At that point I figured I would quit. I figured I was ahead at that point. I thought I would have some meat, later." He explained that he meant that what the witness said would enable him to impeach the identification made. "So, at that point, I left — that was the point I walked out of that

4. The lineup sheet shows that appellant was also identified by a Hershel Johnson at 8:15 P.M. and a John Brady, Jr. at 8:34 P.M. See *Vernon v. State*, 12 Md. App. 157.

room, and was not there when—and was not there representing Anthony at the time he was picked out by [Mr. and Mrs. Borzymowski]." He was asked by the court why he walked out. He replied: "I have no excuse for that. The only reason I walked out was that I said, well —I said to myself, 'Well, they picked out Anthony,' and I figured, 'Well, it didn't make any difference to me, at that point, whether ten people had picked him out or one individual had picked him out.' " Levinson stated that while he was present there was nothing impermissibly suggestive in the conduct of the lineup. Appellant was not singled out in any capacity by wearing special attire or by having bandages on him or anything like that. It was "a good lineup, as far as that aspect goes." He had no criticism of the way in which the lineup was conducted. "No—I looked for it, and I couldn't find it."

The court denied the motion to suppress any evidence concerning identification at the lineup. It gave its reasons:

> "It seems to me, Mr. Levinson was there at the lineup for the purpose of representing the defendant, but, apparently, by lack of communication from either his client or his partners, figures that there was only one case in which Mr. Vernon may have been involved, and was hoping that he had a tactical wedge to drive in any imperfections in the lineup by the gratuitous statements attributed to the witness who was sitting behind Mr. Levinson, and then absented himself from the scene. So that it seems to me, if the State has complied with advising the defendant of his right to counsel and having counsel present, and counsel absents himself, for whatever reason, this cannot be used to defeat the conduct of an otherwise valid and fair lineup. Mr. Levinson being present as counsel had a chance to observe the lineup and says, himself, that he was looking for means to criticize it as

being unfair, but, frankly, had to concede as to its fairness."

## I

Appellant contends that the lineup was illegal on the sole ground that at the precise moment he was identified by Borzymowski his counsel was not present. In the unusual circumstances here existent we think that the lineup may be held to be legal without doing violence to the essential underpinnings of *United States v. Wade*, 388 U. S. 218, or in other words, that the dictates of *Wade* do not compel a holding that it was illegal. We do not believe that counsel's presence at the exact moment of Borzymowski's identification was "necessary to preserve the defendant's right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself", (*Wade* at p. 227); that in making the analysis of "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and ability of counsel to help avoid that prejudice" (at p. 227), the lower court was able to say that potential substantial prejudice to appellant's rights did not inhere in the confrontation between Borzymowski and appellant at the lineup and that the ability of counsel to avoid any prejudice was not impaired; that testimony of counsel himself established that the lineup here was not "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial" (at p. 228) and that there had in fact been no "degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification," (at p. 228). While "privacy results in secrecy" there was no secrecy here. There was no difficulty in depicting what actually transpired and the defense could and did "reconstruct the manner and mode of lineup identification for [the] judge * * * at trial" (at p. 230). We feel that the lineup here was subject to a fair and meaningful objective re-

view at the trial, and believe on our independent constitutional appraisal that the judgment of the lower court on such review was correct. We find on the facts and in the circumstances that the lineup was legal. Thus it could not taint a judicial identification and evidence of identification made at it was not *per se* to be excluded. See *Smith and Samuels v. State,* 6 Md. App. 59. We hold the lower court did not err in denying the motion to suppress the evidence of identification.

## II

Officer McCloskey was in his radio car about 2:10 P.M. on 9 February when he received a call to the 1700 block of Fleet Street at the furniture store "for three suspicious men." On the way to the address he was informed by police radio it was a possible "holdup in progress". He pulled up in front of 1736 Fleet Street and went to the front door of the Fleet Furniture Store; it was locked. Someone hollered "Grab him" and he saw someone running on the street behind him toward Ann Street. The main concern of the officer was the store. He shook the front door. "I observed movement inside the store, and one of the suspects come to the front door and opened the door for me. * * * Well, I didn't know who it was, but when he opened the door, I asked him if he had called the police, and he said, 'No.' I said, 'Well, I got a call, here, for a holdup.' He said, 'Ain't no trouble here,' and he tried to get out past the door, and I stopped him. He said, 'Man,' he said, 'I work here.' He says, 'I got to go some place.' So I said, 'Now, what's the trouble?' He says, 'Ain't no trouble.' He says, 'I told you I work here, and I got to go some place.' So, at that time, I said, 'Well,' I said, 'I don't know if you work here or not.' Then, Mr. DiBlasio come from the rear portion to the front of the store bleeding from the head and staggering, and he said, nobody works there but him &—this man was the one that held him up. So, I placed the suspect under arrest, and Mr. DiBlasio stated that there was three more upstairs that had just run up to the second floor, and I

could hear running on the third floor — on the second floor. So, in company with Officer Taylor, we went to the second floor and apprehended another suspect. Two of them jumped out the front window and ran south on Regester Street." They were apprehended.

According to Borzymowski appellant was standing outside the store as a look-out. A number of police cars responded to the radio alert and as they were pulling up in front of the store appellant ran south on Ann Street towards the get-away car (the automobile in which the five men had driven to the area) which had been "just around the corner from Ann Street on Aliceanna." Two men jumped out of the second story window of the store and ran down Regester Street to Aliceanna Street. They ran to the get-away car but it had departed, appellant having reached it in his flight. An officer had commandeered Borzymowski's car and told him to follow appellant. Borzymowski did so and saw appellant get in the get-away car which pulled away. Borzymowski lost the car because he could not make a U-turn fast enough on Aliceanna Street. The get-away car in which appellant was riding was stopped by Officer Marion Fialkowski. He had received the radio report that "the vehicle and its occupants were wanted for assault and robbery" and first saw the car in the vicinity of Bond and Thomas Street. He followed it to Broadway. "It went north on Broadway between a parking aisle, and right from this parking aisle, which dead-ends at the market, it then made a right, which is something like ten feet, and then left, again, right onto Broadway, continuing north." He pulled it over about a block and a half from the 1700 block of Fleet Street. It contained the driver and one passenger. He made a positive in-court identification of appellant as the passenger. The driver was Robinson. A police espantoon was found in the car.

Appellant urges with regard to the sufficiency of the evidence only that the evidence showed no "type of participation or encouragement" by appellant. Of course the *corpus delicti* of the crimes was established by the testi-

mony of the victim. As for criminal agency the lower court found appellant to be a principal in the second degree in the robbery and a principal in the assault which took place after the robbery when the robber put a knife to the victim's throat and threatened to plunge it in. Appellant being at the scene was more than mere presence as is obvious from the evidence as to his activities prior to the robbery, during the robbery and after the robbery. See *State v. Magliano,* 7 Md. App. 286; *Farmer v. State,* 5 Md. App. 546; *Gunn v. State,* 4 Md. App. 379; *Thomas v. State,* 3 Md. App. 708 as to principals in the second degree. See *Hammond and Couser v. State,* 7 Md. App. 588; *Hernandez v. State,* 7 Md. App. 355; *McLean v. State,* 6 Md. App. 366 as to presence at scene of crime and flight.

The lower court was not clearly erroneous in its judgment on the evidence. Maryland Rule 1086; *Williams v. State,* 5 Md. App. 450.

*Judgments affirmed.*