375 A.2d 766

**Arnold H. RYAVE**

v.

**Lillian RYAVE, Appellant.**

Superior Court of Pennsylvania.

Argued April 13, 1977.

Decided June 29, 1977.

**20.** *See* footnote 16 supra.

80

Robert Raphael, Pittsburgh, with him Raphael, Sheinberg
& Barmen, Pittsburgh, for appellant.

George Shorall, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court erred in sustaining appellee's objections to the master's recommendation that the action be dismissed and in granting a divorce a.v.m.[1] We affirm the lower court's decree.

On June 20, 1947, appellant-wife and appellee-husband were married in Atlantic City, New Jersey. The parties resided in Pittsburgh, Allegheny County. They have four children, two of whom still reside with appellant. On January 13, 1972, appellee filed a complaint in divorce a.v.m. on the grounds of indignities. On May 12, 1974, the lower court appointed a master who conducted hearings on April 22, 1975, and May 12, 1975. Appellee testified as follows: the parties began suffering problems shortly after their marriage. These difficulties intensified during 1965 through 1971 so that life with appellant became intolerable and he left the marital abode in September, 1971, and never lived with appellant again. Appellant constantly derided appellee in the presence of their children and friends by referring to him as a lowly truck driver and a hearse driver.[2] Appellant demeaned appellee by stating that he had an inferior education and occupation. In addition to humiliating appellee in front of business associates, she cursed and derided him at the supper table. Appellee, who has a pilot's license, often flew small planes for business purposes. Appellant frequently wished for his death and told appellee that she wished that he would hit a mountain on the way back and that she prayed that the plane would crash. Further, appellant repeatedly told appellee to leave the house and ex-

1. The Divorce Law, Act of May 2, 1929, P.L. 1237, § 10; as amended Act of March 19, 1943, P.L. 21, § 1; 23 P.S. § 10, as amended. Act of September 22, 1972, P.L. 880, No. 202, § 1.

2. Appellee is a funeral director.

pressed the wish that she were big and strong enough to throw him out. Appellant also constantly ridiculed appellee's family lineage by saying that he was "shit" and that he came from "shit". Appellant referred to appellee's father as an idiot with a cigar in his mouth and to his mother as a deaf mute. Appellant called appellee a "meal ticket". Appellee stated that this constant humiliation and derision caused him great embarrassment and undermined his normal good health to the extent that he was unable to pass the physical examination required to retain his pilot's license due to hypertension. He consulted a physician who advised appellee to leave the home whenever appellant began to nag him. Appellee testified that appellant was completely irresponsible with money and squandered it on luxuries. Because appellant did not prepare meals regularly or clean the house, appellee was forced to hire a maid. Appellee stated that appellant did not bathe herself nor did she clean her clothes. Appellant's daily cycle did not correspond to appellee's. She stayed up almost all night when appellee was asleep and she slept all day. Appellee alleged that appellant openly consorted with another man, Simon Goldfield. Finally appellee stated that he provided all the material items that his family required. Appellee could no longer tolerate the continued harassment by appellant and, in September 1971, after a fight with appellant in which she told him to leave, he moved out of the marital home.

Two other witnesses testified for appellee. His sister stated that the parties' home was unkept and that dishes were always piled in the sink. The family maid, Cheerful Clanagan, testified that appellant frequently nagged appellee while they were eating supper and called him a "bum" or a "half-baked bum".

Appellant testified to a somewhat different version of events. Appellant denied that she was extravagant and further stated that she did clean the house and prepare meals regularly. Appellant admits that she told appellee to drop dead, and that she called him a truck driver. She further admits that she used obscenities and told appellee

that he was "shit" and that he came from "shit". Appellant acknowledged that she told appellee that she hoped his plane would crash and asked him why he didn't just leave the house. She also testified that she called appellee a meal ticket. She denied humiliating appellee in public and she attempted to excuse her conduct by stating that it occurred during arguments and that the remarks were comical. Appellant stated that in 1970, appellee began to see another woman, Gail Lockhart, and that she is the reason that appellee left appellant. Appellant explained that she became friendly with Simon Goldfield only after her separation from appellant and that their relationship was purely platonic.

Appellant presented several witnesses. The parties' 27 year-old daughter, Phyllis Hayes, testified that her mother did clean and cook and that she bathed frequently. She stated that she saw appellee and Ms. Lockhart holding hands prior to her parents' separation. Ms. Lockhart and appellee drove to State College to visit Ms. Hayes in 1971. Ms. Hayes stated that Ms. Lockhart and she were good friends as were appellee and Ms. Lockhart. Ms. Hayes did hear appellant tell appellee to drop dead. The 21 year-old son of the parties also testified that his mother cleaned the house and prepared the meals. He heard appellant tell appellee to drop dead, call appellee a truck driver, and swear at him in arguments. Two other witnesses testified that appellant became friendly with Mr. Goldfield after her separation; and that she visited him in the hospital during his terminal illness.

At the conclusion of the hearings, the master recommended that the lower court deny a divorce because appellee failed to produce sufficient evidence of indignities. In his report, the master indicated that he found that appellant testified in a "frank, honest and straight forward manner and that appellee was evasive, non-specific and extremely weak on the buttressing of his allegations." The master also stated that "the apparent circumstantial relationship existing between Ms. Lockhart and [appellee] remains unexplained and/or rebutted."

The court *en banc* sustained appellee's exceptions to the master's report and granted a divorce a.v.m. In its opinion, the court reviewed the evidence and found that it disclosed a course of abusive treatment by appellant which constituted indignities to the person.

Appellant first contends that appellee is not an innocent and injured spouse because he established a meretricious relationship with another woman prior to his separation from appellant. Appellant and appellee agree that Ms. Lockhart was a friend of the family and that she visited the family home in that capacity prior to their separation. Appellee denies that his relationship with Ms. Lockhart was anything more than friendship. Appellant stated that appellee never denied that he was seeing Ms. Lockhart and that she frequently came to their home in 1971.

The master did not find that appellee engaged in a meretricious relationship prior to the separation. The lower court found that appellee's relationship with Ms. Lockhart 'flowered' after the accrual of the cause of action for divorce, and, thus, cannot be successfully asserted as a defense.

■■■ Section 10(1)(f) of the Pennsylvania Divorce Law, supra, provides *inter alia* that: ". . . [I]t shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, . . .." Thus, appellee must be the innocent and injured spouse in order to obtain a divorce in Pennsylvania. "[T]he principle that the requirements of innocence and injury do not mean that the plaintiff need be wholly free from fault. See *Eifert v. Eifert,* [219 Pa.Super. 373, 281 A.2d 657 (1971)]; *Murphy v. Murphy,* 204 Pa.Super. 576, 205 A.2d 647 (1964); *Jonash v. Jonash,* 199 Pa.Super. 647, 186 A.2d 666 (1962); *Margolis v. Margolis,* [201 Pa.Super. 129, 192 A.2d 228 (1963)]. We have consistently held that [a] party should not be denied a divorce merely because he or she is not entirely without fault: *Faszczewski v. Faszczewski,* 182 Pa.Super. 295, 126 A.2d 773 (1956); *Green v. Green,* 182 Pa.Super. 287, 126 A.2d 477 (1956); *Rech v. Rech,* 176 Pa.Super. 401, 107 A.2d 601

(1954)." *Sells v. Sells,* 228 Pa.Super. 331, 335–336, 323 A.2d 20, 23 (1974). However, if appellee were guilty of adultery prior to the accrual of his cause of action for divorce, then he would not be an innocent and injured spouse. "If the adultery occurred after the right to the divorce had accrued, it is not grounds to deny the divorce." *Gehris v. Gehris,* 233 Pa.Super. 144, 149–150, 334 A.2d 753, 755 (1975).

 In the instant case, appellant presented no testimony of adultery whatsoever. She introduced evidence that in 1970 appellee maintained a friendship with Ms. Lockhart. However, friendship with a member of the opposite sex is not proof of adultery with that person and it does not preclude a finding that appellee was innocent and injured. Moreover, appellant cannot contend that appellee's conduct with another woman provoked her own abusive behavior towards appellee because there is no evidence of a meretricious relationship prior to the parties' separation, nor does appellee's conduct give rise to a reasonable suspicion of infidelity. See *DeBias v. DeBias,* 245 Pa.Super. 266, 369 A.2d 396 (1976). Ms. Lockhart was a family friend who visited the home with the consent of both parties. In short, appellee's cause of action for divorce accrued over a period of six years. Appellant failed to prove that appellee engaged in a meretricious relationship during that period or that his conduct gave rise to a reasonable suspicion of infidelity so as to lose the status of an innocent and injured spouse.

Appellant next contends that the master's findings as to the credibility of witnesses should not be disregarded when these findings are supported by the record, and, in a closely related allegation, appellant argues that there is insufficient evidence of indignities to the person. We reiterate the controlling standard as enunciated in *Gehris v. Gehris,* 233 Pa.Super. 144, 148, 334 A.2d 753, 755 (1975):

██ "The law is clear that when a divorce matter is heard by a judge sitting without a jury, this Court must make a complete and independent review of the record of the proceedings below. *Eifert v. Eifert,* 219 Pa.Super. 373, 281

A.2d 657 (1971). The Court's review extends even to matters of credibility. *Del Vecchio v. Del Vecchio,* 169 Pa.Super. 617, 84 A.2d 261 (1951). The Court must 'examin[e] the record to discover inherent improbabilities in the stories of the witnesses, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehoods . . . .' 12 P.L.E. § 143 Divorce; see also, *Faszczewski v. Faszczewski,* 182 Pa.Super. 295, 126 A.2d 773 (1956); *Rankin v. Rankin,* 181 Pa.Super. 414, 124 A.2d 639 (1956). The obvious important exception to de novo review by a reviewing court is that great weight must be accorded to the findings of the court or master below if the issues of credibility are ones that are necessarily resolved by personal observations. For example, if the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court. See, *Rankin,* supra; *Uhlinger v. Uhlinger,* 169 Pa.Super. 574, 83 A.2d 423 (1951); *Partleton v. Partleton,* 169 Pa.Super. 485, 82 A.2d 684 (1951); *Spence v. Spence,* 167 Pa.Super. 248, 74 A.2d 495 (1950)."

See, *Dougherty v. Dougherty,* 235 Pa.Super. 122, 339 A.2d 81 (1975). The lower court need not accept the findings of the master and can make its own determination. Our Court is also duty-bound to make a complete and independent investigation of the evidence in order to discharge our obligation. *Fishel v. Fishel,* 217 Pa.Super. 171, 269 A.2d 372 (1970); *Cammann v. Cammann,* 217 Pa.Super. 376, 272 A.2d 241 (1970).

In a case which amounts to little more than a swearing contest between two parties in which there is no corroborative evidence and each party denies the allegations of the other, the master's finding on credibility is to be accorded great weight. We believe that in the instant case, the master's findings are not supported by the record and, that the master's finding on credibility is not dispositive because appellant's own testimony established a course of conduct which amounts to indignities.

"The Act of May 2, 1929, P.L. 1237, § 10(1)(f), *as amended,* 23 P.S. § 10(1)(f) allows the innocent and injured partner to a marriage to obtain a divorce from the bond of matrimony where the other spouse '[s]hall have offered such indignities to the person of the innocent and injured spouse, as to render his or her condition intolerable and life burdensome.' Indignities have not been defined by the law, but rather conduct alleged to be productive of indignities has been evaluated together with the peculiar circumstances of each case. *See Boyer v. Boyer,* 183 Pa.Super. 260, 130 A.2d 265 (1957); *McLaughlin v. McLaughlin,* 170 Pa.Super. 516, 87 A.2d 101 (1952). Appellate court have attempted to draw general guidelines thought to be instructive in shaping the offense of indignities. It has thus generally been determined that such conduct must constitute a course of behavior which is humiliating and degrading, inconsistent with the injured individuals's position as a [spouse] making that condition intolerable and life a burden to [him or] her. A single act of indignity is not sufficient, but a course of treatment 'of such character as to render the condition of any [person] of *ordinary sensibility* and *delicacy of feeling* intolerable and . . . life burdensome will' present grounds for divorce. *Commonwealth ex rel. Whitney v. Whitney,* 160 Pa.Super. 224, 228, 50 A.2d 732, 734 (1947) (emphasis original). Such conduct is understood to manifest the spirit of malevolence, hate and estrangement which has come to replace natural love and affection in a marriage and is central to a charge of indignities. *Barr v. Barr,* supra, [232 Pa.Super. 9, 331 A.2d 774]; *Sells v. Sells,* supra." *Steinke v. Steinke,* 238 Pa.Super. 74, 78, 357 A.2d 674, 676 (1975). See also *Schrock v. Schrock,* 241 Pa.Super. 53, 359 A.2d 435 (1976).

In the instant case, appellee testified that appellant constantly derided and humiliated him in front of family, friends, and business acquaintances. Her vituperative remarks ridiculed his occupation, education, and family lineage. Appellant further manifested her hatred for appellee by repeatedly wishing for his death and telling him to leave the home. Appellant admits making almost all of the above

remarks to appellee but she attempts to excuse them by saying that they were comical or made during an argument. It is obvious that appellee, a person of ordinary sensibilities, would find that appellant's constant prayers for his death and wishes that he leave the marital home manifested a spirit of malevolence, hate and estrangement. These remarks cannot be justified as comical, or merely argumentative because a normal person would not so understand them. Moreover, appellant's scatological aspersions constituted such vulgarity and incivility as to degrade and humiliate appellee. Due to the nature and substance of appellant's conduct we find that her explanation is simply not adequate to justify her behavior toward appellee. We have carefully reviewed the evidence de novo, passed on its weight, and on the credibility of the witnesses, and reached an independent conclusion on the merits. We believe that the instant transcript reveals a course of conduct, admitted by appellant, which constitutes indignities to the person of appellee so as to render his condition intolerable and his life burdensome.

The decree in divorce a.v.m. is affirmed.

VAN der VOORT, J., did not participate in the consideration or decision of this case.

SPAETH, J., concurs in the result.

PRICE, J., dissents.