420 A.2d 537

**Glenn Martin MOORHEAD,**

v.

**Doris Elizabeth MOORHEAD, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 13, 1979.

Filed May 23, 1980.

Harry O. Falls, New Castle, for appellant.

Donald E. Williams, New Castle, for appellee.

Before PRICE, HESTER and CAVANAUGH, JJ.

HESTER, Judge:

Presently before the court is appellant's appeal from an Order dated January 3, 1979 granting appellee a divorce from the bonds of matrimony from appellant on the grounds of indignities to the person.

We reverse and dismiss the complaint.

In *McCaskey v. McCaskey*, 253 Pa.Super. 360, 364, 385 A.2d 378, 381 (1978), we again reiterated the cornerstones of our scope of review as well as the applicable principles of law in an appeal from the grant of a divorce from the bonds of matrimony on the grounds of indignities to the person:

"The law is clear that when a divorce matter is heard by a judge sitting without a jury, this Court must make a complete and independent review of the record of the proceedings below. *Eifert v. Eifert*, 219 Pa.Super. 373, 281 A.2d 657 (1971). The Court's review extends even to matters of credibility. *Del Vecchio v. Del Vecchio*, 169 Pa.Super. 617, 84 A.2d 261 (1951). The Court must 'examin[e] the record to discover inherent improbabilities in the stories of the witnesses, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehoods . . . .' 12 P.L.E. § 143 Divorce; see also, *Faszczewski v. Faszczewski*, 182 Pa.Super. 295, 126 A.2d 773 (1956); *Rankin v. Rankin*, 181 Pa.Super. 414, 124 A.2d 639 (1956)." *Ryave v. Ryave*, 249 Pa.Super. 78, 85, 375 A.2d 766, 770 (1977); *Barton v. Barton*, 248 Pa.Super. 278, 375 A.2d 96 (1977); *Shacreaw*

*v. Shacreaw,* 248 Pa.Super. 223, 375 A.2d 68 (1977). However, we have frequently stated: "while the findings and recommendation of the master are only advisory, where the issue is one of credibility and the master is the one who heard and observed the witnesses, his findings should be given the fullest consideration. *Schrock v. Schrock,* 241 Pa.Super. 53, 359 A.2d 435 (1976); *Gehris v. Gehris,* 233 Pa.Super. 144, 334 A.2d 753 (1975)." *DeBias v. DeBias,* 245 Pa.Super. 266, 272, 369 A.2d 396, 399 (1976)."

To crystalize this distinction, the *Gehris v. Gehris* court, supra at 755 opined:

> For example, if the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court.

The *McCaskey* court (supra at p. 381) continued:

Section 10(f) of the Pennsylvania Divorce Law,[1] supra, provides *inter alia* that: " . . .

> [I]t shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, whenever it shall be judged, . . . that the other spouse: . . . [s]hall have offered such indignities to the person of the injured and innocent spouse, as to render his or her condition intolerable and life burdensome." "While our appellate courts have been reluctant to formulate a general definition of what constitutes 'indignities,' we have noted that indignities may consist of vulgarity, unmerited reproach, habitual contumely studied neglect, intentional incivility, manifest disdain, abusive language, or malignant ridicule. *Gehris v. Gehris,* supra, 233 Pa.Super. at 147–48, 334 A.2d at 754–755. See also *McKrell v. McKrell,* 352 Pa. 173, 42

---

1. 1929, May 2, P.L. 1237, § 1 et seq.; 23 P.S. § 1 et seq. Note that at this time, Governor Thornburgh has recently signed into law House Bill No. 640 Session of 79, Printer's No. 3045 known as the "Divorce Code" which in relevant part totally eliminates the "fault" and "injured and innocent" requirements under prior law. The instant case, however, is covered by said prior law.

A.2d 609 (1945)." *Hargrove v. Hargrove*, 252 Pa.Super. 120, 381 A.2d 143, 148 (1977). Moreover, "It has thus generally been determined that such conduct must constitute a course of behavior which is humiliating and degrading, inconsistent with the injured individual's position as a [spouse] making that condition intolerable and life a burden to [him or] her. A single act of indignity is not sufficient, but a course of treatment 'of such character as to render the condition of any [person] of *ordinary sensibility* and *delicacy of feeling* intolerable and . . . life burdensome will' present grounds for divorce. *Commonwealth ex rel. Whitney v. Whitney*, 160 Pa.Super. 224, 228, 50 A.2d 732, 734 (1947) (emphasis original). Such conduct is understood to manifest the spirit of malevolence, hate and estrangement which has come to replace natural love and affection in a marriage and is central to a charge of indignities. *Barr v. Barr* supra, [232 Pa.Super. 9, 331 A.2d 774]; *Sells v. Sells*, 228 Pa.Super. 331, 323 A.2d 20, supra. *Steinke v. Steinke*, 238 Pa.Super. 74, 78, 357 A.2d 674, 676 (1975). See also *Schrock v. Schrock*, 241 Pa.Super. 53, 359 A.2d 435 (1976)." *Ryave [Ryave v. Ryave]*, supra, 249 Pa.Super. 78, at 87, 375 A.2d 766, at 771.

Thus as stated above in Section 10(f) of the Pennsylvania Divorce Law, supra, appellee must be the innocent and injured spouse in order to obtain a divorce in Pennsylvania. "[T]he principle that the requirements of innocence and injury do not mean that the plaintiff need be wholly free from fault. See *Eifert v. Eifert*, [219 Pa.Super. 373, 281 A.2d 657 (1971)]; *Murphy v. Murphy*, 204 Pa.Super. 576, 205 A.2d 647 (1964); *Jonash v. Jonash*, 199 Pa.Super. 647, 186 A.2d 666 (1962); *Margolis v. Margolis* [201 Pa.Super. 129, 192 A.2d 228 (1963)]. We have consistently held that [a] party should not be denied a divorce merely because he or she is not entirely without fault."

In the instant case, however, and following a careful review of the record, we conclude that appellee was neither innocent nor injured.

At the Master's Hearing, a total of eight witnesses testified: Testifying on behalf of appellee was appellee himself;

his sister, Mary Elizabeth Moorhead, who had lived with the parties in 1976 for six weeks after she had broken both of her wrists; and Dixie Lee DiLorenzo, at the time separated from appellant's son by a previous marriage.

At the time of the Master's Hearing, appellee was 74 years old, having retired from work four years earlier.

He and appellant were married November 6, 1965 and separated May 8, 1977. Appellee was approximately six feet tall, weighing 240 pounds.

On direct examination, appellee related his suspicion that without his permission, appellant would take money out of his trousers (R. 8a, 9a). In support of this contention, appellee produced two documents (Exhibit A and B) which tended to indicate that appellant had given her son approximately $40, $20 for his birthday (R. 12a) and $20 for a trip to Washington, D. C. (R. 14a).

Appellee testified that he paid all bills (R. 18a); that he gave appellant spending money (R. 20a) and that he believed that appellant would go to the store and spend more money than was necessary " . . . to make me spend money–anything to make me spend money–she was happy about" (R. 20a).

Appellee's further testimony included the recollection that appellant was upset over the Last Will and Testament of appellee's sister (R. 15a) because appellee was given only a life estate to the home in which appellee and appellant resided and therefore if appellee pre–deceased appellant, appellant would have no place to live (R. 15a, 17a).

Appellee also recalled that appellant wished that "time and time again–that the bubble on that aneurysm would bust–and my pacemaker would quit running" (R. 21a).

Appellee also testified that appellant would leave their common abode on weekends and stay with her son at his trailer (R. 21a, 23a).

On cross–examination, appellee admitted that he gave appellant very little money (R. 28a); that there was no set budget (R. 32a); that the moneys appellant gave to her son may have been her money from an inheritance (R. 33a);

that appellee prohibited appellant's son from visiting their home (R. 41a); that on the weekends appellant would visit her son, she would prepare food for appellee; that the weekend prior to their separation, he told appellant not to come back (R. 44a) and that he thereafter changed the locks on the house (R. 39a); that despite appellant having a driver's license, appellee refused to let appellant drive his car (R. 37a); that appellee never bought appellant birthday, anniversary or Christmas presents (R. 43a); that the parties went out socially very infrequently (R. 42a); and that during an argument, appellee raised a chair towards appellant, although he never struck her with same (R. 44a).

Appellee's sister testified that during the six–week period that she resided with the parties, she saw appellee give appellant money on two occasions (R. 50a); that she complained that appellant "was banging doors–and dishes and things–and playing the radio real loud" (R. 49a); and that appellant's weekend stays with her son was upsetting to the appellee (R. 51a).

Appellee's third witness was appellant's daughter–in–law who at the time of the Master's Hearing, had been separated from appellant's son by a previous marriage. She testified that appellant told her that she had taken money from appellee's pocket and that the money which appellant had allegedly removed from appellee's pants pocket, was spent by appellant on her grandson (this witness's son) (R. 57a). Further, this witness testified on cross–examination that she objected to appellant buying clothing for her children (R. 63a).

Appellant's case consisted of five witnesses: herself and four other women who considered themselves friends of either appellant and appellee or only the appellant. The first witness, Luella Richael, a neighbor who lived across the road, testified that she visited the parties' home "every other day–or maybe every day" (R. 66a). She testified appellant was a good cook, a good housekeeper (R. 66a); that appellant always prepared appellee's meals (R. 70a); that appellant never had any money to go shopping; and in fact, appellant was forced to drop out of Sunday school class

meetings because she was afraid to ask appellee for the money necessary to attend (R. 67a). This witness further testified that the parties never celebrated birthdays, Christmas or anniversaries and as a result of this, appellant "would cry" (R. 68a).

The next three witnesses: Helen A. Messner, also a neighbor and friend; Marie Steinbrink, appellant's friend for approximately 30 years; and Dorothy Fye, appellant's friend for approximately 50 years, all confirmed that appellant was a good housekeeper, a good cook and further that appellant never had any money either for food or clothes shopping. Mrs. Messner related a situation when she lent appellant $2 to purchase two used dresses at the Mission. Mrs. Messner recalled that when appellee found out about this, he threw the $2 to Mrs. Messner and scolded her about lending money to appellant and yelling "Don't ever let it happen again" (R. 76a). Mrs. Steinbrink confirmed this situation by recalling that appellant ". . . didn't have clothes" (R. 83a).

Finally, the appellant, Doris Elizabeth Moorhead, testified that the parties had a good marriage for approximately the first nine months until appellee's sister Luella died and that the trouble started then " . . . because he had to pay the bills—and he was too stingy to buy groceries or anything else" (R. 89a).

Appellant testified that appellee liked her cooking (R. 91a); that she was a good housekeeper who would "move the furniture and polish it—cleaned windows, etc." (R. 91a); that whenever she would ask for some money, he always refused (R. 92a); that he took her out approximately three times a year (R. 92a); that sometimes he didn't speak to her for days on end (R. 92a); that he didn't buy her clothes (R. 93a); nor did he buy her anything on her birthday, their anniversary or for Christmas (R. 93a–94a); that since they lived in rural area and he would not let her drive his car although she was a capable driver, the situation more or less left her marooned (R. 90a); that Mrs. Moorhead's recollection of the $2 dress loan was quite accurate and that all of the above circumstances made her feel "pretty darned bad—like an unpaid maid" (R. 94a).

Appellant admitted taking some money over a 12–year period of time from appellee's wallet (R. 96a); appellant guessed that over the 12–year period, she had taken approximately $300 (R. 97a) or around $25 a month (sic) (R. 97a).

Appellant testified that when appellee found out about her sending $20 to her son, appellee prohibited appellant's son from ever coming on to their property again (R. 98a); appellant was permitted to have certain visitors in the home, but not her (appellant's) family (R. 98a).

Appellant recalled two incidents which almost led to physical violence and bodily harm—once when he put a chair over his head and said: "You S.O.B., I will kill you" (R. 99a), and another time of threatening her with a pan (R. 102a).

Finally appellant testified that appellee did not take a bath for four weeks at a time—" . . . and I washed his back and his hair when he took a bath—and his underwear was a disgrace when he took them off" (R. 102a).

In conclusion, appellant testified that the parties had not slept together as man and wife for ten years . . . "he had no desire for sex—and he was too dirty to sleep with anyway" (R. 104a).

On cross–examination, appellant admitted that their biggest trouble was money—" . . . because he was so stingy" (R. 106a).

In response to a direct question, appellant said she would not go back and stay with appellee (R. 109a) but that he never came and offered to take her back anyway (R. 110a), and in response to the question "Do you think your marriage shouldn't exist any longer?" Appellant responded: "I don't think so" (sic) (R. 105a).

The Master's Report which included Findings of Fact and Recommendations, recommended that a divorce be granted to appellee on the grounds of indignities to the person. The lower court thereafter reviewed the notes of testimony taken and adopted the Master's recommendation and granted appellee a Decree in Divorce on the grounds of indignities.

The lower court dismissed appellant's and her witnesses' testimony to appellee's penuriousness and his refusal to allow her to drive his car and his failure to take her out socially, but concluded that these matters were not serious enough to justify appellant's conduct or to result in finding that appellee is not an injured and innocent spouse.

On the other hand, the lower court found that appellant's weekend leaves to visit her son, her removal of money from appellee's trouser pockets over a 12–year period in an estimated amount of $300 and her allegedly telling him that she wished that the bubble on an aneurysm he had would burst and that his pacemaker would quit running, "indicated settled animosity on the part of (appellant) toward the (appellee) and shows a course of conduct on the part of the (appellant) which rendered her husband's condition intolerable and his life burdensome.

We disagree with those Findings of Fact and Conclusions of Law. We find that the record is abundantly and manifestly clear that appellee was neither injured nor innocent. Because of the negation of this critical finding, we conclude that it was error for a lower court to grant appellee a Decree in Divorce.

Hence, we reverse and dismiss the complaint.

Order reversed and complaint dismissed.