403 A.2d 999

**John A. BONIEWICZ**

v.

**Catherine BONIEWICZ, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 6, 1977.

Decided May 18, 1979.

212

Thomas J. Jones, Scranton, for appellant.

Michael R. Shehadi, Throop, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PER CURIAM:

The judges who heard this appeal being equally divided, the order and decree of the court below is affirmed.

PRICE, J., files an opinion in support of affirmance in ·which VAN der VOORT, J., joins.

CERCONE, P. J., files an opinion in support of reversal.

SPAETH, J., files an opinion in support of reversal.

JACOBS and WATKINS, former President Judges and HOFFMAN, J., did not participate in the consideration or decision of this case.

PRICE, Judge, in support of affirmance:

This appeal arises from the granting of a decree in divorce to John A. Boniewicz, appellee, based upon indignities to the person. Appellee's complaint also asserted that he was subjected to cruel and barbarous treatment, but the lower court did not consider those grounds, instead basing its order only upon indignities. For the reasons stated herein, we affirm the decree.

We gather from a thorough reading of the record that the parties were married on June 23, 1973. The husband is 30 years of age and the wife is 37 years of age. No children were born of the union. Appellee testified that approxi-

mately three months after the marriage, financial problems began to surface. He testified that appellant opened numerous charge accounts, without appellee's authorization but apparently in his name, by forging his signature. There were two department store accounts, opened by appellee before the marriage, which appellant converted to alternate pay plans so that the maximum amount chargeable was increased. Appellee said that he did not know the conditions of the accounts, or in some cases even of their existence, because mail which came to the house was concealed from him. He usually learned of his shaky financial footing through telephone calls to his place of employment. Some of these calls were made by collection agencies to whom delinquent accounts were referred, and others were from individual creditors requesting payment and sometimes informing appellee that credit was being terminated. Appellee testified that one personal loan was taken out at the bank, also in appellee's name, but without his knowledge or approval.

When appellee confronted appellant about her financial indiscretions she simply called him "cheap." When appellee's attention was called to any delinquent accounts, he testified that he terminated the account, but that appellant would simply find a new source, finally enlarging her reach to small stores in neighboring communities.

Appellee also testified that, early in the marriage, money he gave to his wife for payment of bills never reached its proper destination. Often checks were returned for insufficient funds. Appellee testified that appellant endorsed and cashed his income tax refund check, and spent the proceeds, without his knowledge. It was appellee's contention that only two purchases on any of the various accounts, which he joined in early in the marriage, ever redounded to the joint benefit of the two parties, namely a television set and freezer. He contended that he did not know in what way other goods or funds were disposed of by the wife. Appellee stated that he took various part-time jobs to supplement his regular earnings and to cover some of these bills.

It was appellant's contention that any purchases made were necessary for the joint benefit of the parties. She denied forging her husband's name in order to secure credit. She said that she endorsed both names on the income tax refund check. She also claimed to have helped to make payments on some of the accounts, and she denied concealing from her husband any statements mailed to their home. She also denied ever calling appellee names or referring to him as "cheap."

The lower court found that appellee's testimony was credible and that the evidence as a whole showed that appellant, "on numerous occasions . . . unjustifiably abused, and misused the right to invoke her husband's contractual rights by signing his name to procure credit and loans." Judging her to have behaved in a "fiscally irresponsible manner," the court concluded that appellee was subjected to humiliation and embarrassment and that the wife's course of conduct led to an inevitable "permanent evaporation of trust between the parties."

■ This court must, on appeal, make an independent evaluation of the record to determine the existence of a cause of action for divorce. *DeBias v. DeBias*, 245 Pa.Super. 266, 369 A.2d 396 (1976); *Steinke v. Steinke*, 238 Pa.Super. 74, 357 A.2d 674 (1975). In so doing, we are ever mindful that

> "[t]he obvious important exception to de novo review by a reviewing court is that great weight must be accorded to the findings of the court or master below if the issues of credibility are ones that are necessarily resolved by personal observations. For example, if the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court. [Citations omitted.]" *Gehris v. Gehris*, 233 Pa.Super. 144, 148, 334 A.2d 753, 755 (1975). *See Barton v. Barton*, 248 Pa.Super. 278, 375 A.2d 96 (1977).

■ Indignities, the ground upon which the divorce herein was granted, have been defined as follows: "Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement [citations omitted]." *McKrell v. McKrell*, 352 Pa. 173, 180, 42 A.2d 609, 612 (1945), *quoting Martin v. Martin*, 154 Pa.Super. 313, 317, 35 A.2d 546, 548 (1944). When attempting to determine the existence of indignities, no general rule can be formulated, for a finding of indignities depends upon all of the facts and circumstances of each particular case. *Riley v. Riley*, 246 Pa.Super. 265, 369 A.2d 1314 (1976); *Schrock v. Schrock*, 241 Pa.Super. 53, 359 A.2d 435 (1976); *Sells v. Sells*, 228 Pa.Super. 331, 323 A.2d 20 (1974). The burden is placed upon the plaintiff, however, to demonstrate that a course of conduct has been engaged in by the spouse which is humiliating, degrading, and inconsistent with the innocent and injured plaintiff's position, thus rendering his condition intolerable and his life burdensome. *Schrock v. Schrock, supra*; *Ryave v. Ryave*, 249 Pa.Super. 78, 375 A.2d 766 (1977).

Our research has uncovered only several cases concerning divorces granted upon evidence of financial difficulties. Our court has held that extravagance not related to a willful intention to humiliate is not evidence that will warrant a divorce based upon indignities to the person. *Lombard v. Lombard*, 194 Pa.Super. 162, 166 A.2d 98 (1960); *Blose v. Blose*, 163 Pa.Super. 322, 61 A.2d 370 (1948); *Hepworth v. Hepworth*, 129 Pa.Super. 360, 195 A. 924 (1937). See 2 *Freedman*, Law on Marriage and Divorce in Pennsylvania, § 333 (2d ed. 1957).

The most recent case, *Lombard v. Lombard, supra*, was distinguished by the court below. In *Lombard*, the wife never admitted forging her husband's name on any checks. In the instant case, however, appellant did admit that she endorsed her husband's signature on two occasions without his authorization. The court below noted that a course of

conduct was established through "[s]ubstantial oral evidence . . . that [appellant] had followed a similar course of conduct on numerous other occasions." The court concluded that "[the] Court was presented with a complaint based not upon extravagance but rather deceit and calculated deception." In none of the three cases cited, *Lombard, Blose,* or *Hepworth,* was the evidence of financial indiscretion as extensive as it is in this case. More importantly, in none of those cases was the court presented with such overwhelming evidence of the damaging repercussions of the wife's financial shenanigans. In the instant case, appellee was harassed innumerable times at work by creditors' inquiring telephone calls. His credit was so impaired that accounts were cancelled and payment plans imposed. In spite of appellee's inability to keep up with his wife's purchasing, and his overtures that she discontinue her practices, she persisted. Even though he then took on extra work to undo the damage done, appellant's spending continued. Bills were concealed, money appropriated to purposes contrary to appellee's wishes and signatures forged. Appellant's actions evidenced deceit and calculated deception, not mere "extravagance."

To further bolster appellee's plea for a divorce, he testified to threats of physical harm that appellant had made against him. He also testified that on August 2, 1976, he awakened and opened his eyes to see water being poured into his face by appellant. The scalding water burned his face, neck, and chest. Appellee testified that appellant threatened to kill him and that she came toward him a second time with more hot water, threatening to burn him a second time. Appellee stated that appellant tried to prevent him from leaving the house by cutting some wires in his automobile, but that he was able to leave. Appellee called Frank Manasek, a friend who worked at the garage with him, who testified that he saw appellee shortly after the hot-water incident, that the burns were extensive, that application of burn medicine was impossible because the skin kept breaking away, and that he advised appellee to go to

the hospital. Appellee was unable to work for several days as a result of the incident.

In *Blum v. Blum*, 140 Pa.Super. 72, 13 A.2d 118 (1940), this court recognized that while evidence relating to cruel and barbarous treatment may not be sufficient to sustain a divorce on that ground, the evidence may be considered in connection with a charge of indignities. Clearly, the hotwater rampage and threats of killing appellee, when considered along with the financial nightmares to which appellant subjected appellee, were clearly sufficient to support a finding of settled hate and estrangement. Appellee clearly established a course of treatment rendering his condition intolerable and his life burdensome. Therefore, under the circumstances of this case, we find that the court below properly entered a decree in divorce for appellee.

We affirm the order and decree of the court below.

VAN der VOORT, J. joins this opinion.

CERCONE, President Judge, in support of reversal:

In this appeal, the lower court held that the fiscally irresponsible acts of appellant coupled with an isolated incident involving scalding water amounted to a case of indignities to the person. Since the record does not support a finding of any legally recognized ground for divorce in Pennsylvania, the lower court's decree granting the divorce should be reversed.

The record discloses testimony by the husband concerning charge accounts that appellant allegedly opened and used. According to the husband, appellant's extravagant spending caused him much embarrassment when creditors telephoned him at work concerning the accounts. His credit rating was damaged due to these spendings, all to his financial detriment. Despite these accusations, the husband did not present any tangible evidence on these various accounts to prove who had made the purchases and how much money had actually been expended. Instead, appellant contradicted the husband's testimony by testifying that the items purchased were necessaries for the home.

It is true that the issue of the credibility of the witnesses is for the trial court. *Gehris v. Gehris*, 233 Pa.Super. 144, 148, 334 A.2d 753, 755 (1975). However, "[e]ven assuming the husband is correct, extravagance, unrelated to a willful intention to humiliate, is not evidence which will warrant a divorce on the grounds of indignities to the person. *Hepworth v. Hepworth*, 129 Pa.Super. 360, 195 A. 924 (1937); *Blose v. Blose*, 163 Pa.Super. 322, 61 A.2d 370 (1948); Freedman, Law of Marriage and Divorce in Pa., Vol. 2, 2d ed., § 333." *Lombard v. Lombard*, 194 Pa.Super. 162, 166, 166 A.2d 98 (1960). The lower court feels that the testimony elicited from the parties shows a calculated plan of financial indiscretions that amount to deceit and not mere extravagance. There is no support for those conclusions in the record, nor does the testimony manifest any "willful intention to humiliate" on the part of appellant.

This case presents the issue of how far we, as courts, may look into the private problems of a family. The extensive probing into the private financial matters of a marital household that occurs in this case delves too deeply into the heart of problems that many families experience. If we broaden the scope of our review into the essence of family life, the time will come that the mere disagreement over typical family problems will be grounds for divorce. Such a judgment is one for the legislature to make and not one upon which the courts should expand.

As for appellee's claims of appellant's threats and physical abuse, the threats upon the husband's life allegedly made by appellant are hardly believable. Appellant testified to her height and weight as being four feet eleven inches tall, one hundred twelve pounds. Appellee is six feet three inches tall and weighs two hundred sixty pounds. Certainly the parties' physical stature alone demonstrates that the husband could not have truly been fearful of the wife. Although the scalding incident may have occurred as the husband testified, one cannot ignore the testimony that the wife was heavily sedated at the time and subsequently hospitalized for her nervous condition and overmedication.

We would reverse the order of the lower court that granted the decree in divorce.

SPAETH, Judge, in support of reversal:

I should remand for further hearing. Much of the evidence concerned financial transactions or medical treatment. However, the financial records were not produced, nor was medical testimony presented. The testimony of the parties was contradictory in the extreme. Without documentary or disinterested expert testimony, I am unwilling to make an assessment of credibility.