421 A.2d 417

**Lillian A. BRITTON**

v.

**Harry Robert BRITTON, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1979.

Filed July 25, 1980.

Harry R. Britton, Jr., appellant, in pro. per.

James D. McDonald Jr., Erie, for appellee.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from an order granting a divorce on the grounds of indignities and desertion.[1]

On February 24, 1978, the wife filed a complaint for divorce, alleging indignities and desertion. The lower court appointed a master, who held a hearing on April 20. On April 26, the master filed a report recommending that the wife be granted a divorce on both of the alleged grounds. On November 28, the lower court dismissed the husband's exceptions to the master's report, stating that "[t]he Court cannot conceive of a woman who more richly deserves a divorce than Lillian A. Britton." On December 22, the lower court entered a final decree of divorce, and the husband brought this appeal.

In *Keller v. Keller*, 275 Pa.Super. 573, 419 A.2d 49, (1980), this court stated:

1. Act of May 2, 1929, P.L. 1237, § 10, *as amended*, 23 P.S. § 10 (Purdon's 1955).

On an appeal from a divorce decree, we are obliged to make an independent review of the record. *Barr v. Barr,* 232 Pa.Super. 9, 331 A.2d 774 (1974); *Nacrelli v. Nacrelli,* 288 Pa. 1, 136 A. 228 (1927). However, "[a] report of a master who has had the advantage of seeing and hearing the parties and their witnesses, is, nevertheless, to be given fullest consideration." *Vautier v. Vautier,* 138 Pa. Super. 366, 367, 11 A.2d 207, 208 (1939). *See also Lyons v. Lyons,* 116 Pa.Super. 385, 176 A. 792 (1935).

To make out a charge of indignities, three elements must be proved: (1) a course of conduct that, although varying according to the circumstances of each case, must in every case (2) be inconsistent with the marital relationship, and (3) render the condition of the innocent party intolerable and his or her life burdensome. *Steinke v. Steinke,* 238 Pa.Super. 74, 85, 357 A.2d 674, 680–81 (1976) (SPAETH, J., concurring) (collecting cases). Although no general rule can be formulated as to what constitutes indignities in a particular case, the matter being one that depends upon all the circumstances of the particular case and the position in life, character, and disposition of the parties, *Margolis v. Margolis,* 201 Pa.Super. 129, 133, 192 A.2d 228, 230 (1963), our cases hold that proof of "vulgarities, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, or malignant ridicule" may be sufficient to make out a case for divorce based on indignities. *Barton v. Barton,* 248 Pa.Super. 278, 283, 375 A.2d 96, 98 (1977). *See also Bristol v. Baranyi,* 259 Pa.Super. 418, 393 A.2d 897 (1978). Moreover, several of these factors "may coalesce to justify a finding of indignities, although taken separately, no single incident or factor would be sufficient." *Barton v. Barton, supra,* 248 Pa.Super. at 283, 375 A.3d at 98. Finally, it should be noted that . . . the burden of proving indignities was on the husband as the party seeking the divorce, *Mintz v. Mintz,* 258 Pa.Super. 187, 392 A.2d 747 (1978); *Taddigs v. Taddigs,* 200 Pa.Super. 29, 186 A.2d 455 (1962), and that the husband was required to

prove that he was an innocent and injured spouse, *Mintz v. Mintz, supra.*

In *Partleton v. Partleton,* 169 Pa.Super. 485, 82 A.2d 684 (1954), this court stated:

Desertion which entitles an innocent and injured spouse to a divorce is 'an actual abandonment of matrimonial cohabitation, with an intent to desert, willfully and maliciously persisted in, without cause for two years.' *Ingersoll v. Ingersoll,* 49 Pa. 249, 251; *Grace v. Grace,* 165 Pa.Super. 336, 338, 68 A.2d 197, *see* § 10, "The Divorce Law of May 2, 1929," P.L. 1237, as amended, 23 P.S. 10. Guilty intent is manifested where, without cause or consent, either party withdraws from the residence of the other; if the desertion is intentional it is willful; if willful, it is malicious. *Dougherty v. Dougherty,* 166 Pa.Super. 219, 70 A.2d 411; *Grace v. Grace, supra; Hedderson v. Hedderson,* 35 Pa.Super. 629, 631.

In *Santarsiero v. Santarsiero,* 231 Pa.Super. 286, 331 A.2d 868, 871 (1974) (SPAETH, J., dissenting), it was stated:

In a desertion case the burden is initially on the plaintiff to prove the defendant's 'absence from the habitation ... for ... two years ...' *Wagner v. Wagner,* 223 Pa.Super. 241, 299 A.2d 45, 47 (1972); *Ziengenfus v. Ziegenfus,* 159 Pa.Super. 521, 522, 49 A.2d 275 (1946) ....

When the plaintiff has proved absence from the habitation the burden shifts to the defendant 'to establish by clear and convincing evidence that (1) her separation from him was not desertion because plaintiff had consented or encouraged it; or (2) her separation was not wilful and malicious desertion but was justified by his unlawful conduct which amounted to grounds for divorce.' *Wagner v. Wagner, supra,* 223 Pa.Super. at 244, 299 A.2d at 47. *See also Zimmerman v. Zimmerman,* 428 Pa. 118, 123, 236 A.2d 785, 788 (1968); *MacDonnell v. MacDonnell,* 190 Pa.Super. 397, 400, 154 A.2d 267, 268 (1959); *Ewing v. Ewing,* 140 Pa.Super. 448, 449, 14 A.2d 149, 150 (1940).

Finally, in *Zimmerman v. Zimmerman, supra* 428 Pa. at 123, 236 A.2d at 788, the Supreme Court stated:

'[I]t is well settled that to bar the running of the term [of two years] against the offending party, an offer of reconciliation or an offer to return to the injured party must be made in good faith with the desire that it be accepted and with the intention that if the reconciliation is effected the derelict party will honestly perform his whole duty as husband towards the one whom he deserted. Such an offer must be accepted, and a party refusing it is not in a position to demand a decree of divorce.' (*Quoting Gordon v. Gordon*, 208 Pa. 186, 187, 57 A. 525 (1904).)

We do not propose to summarize the entire record. However, among the master's findings were the following.

The parties were married on May 20, 1950, in Franklin Center, Pennsylvania. From the outset, the marriage was troubled. The parties frequently argued about financial matters. The wife wanted new furniture for their house, but the husband thought her unreasonable. On one occasion, the husband forced the wife to return certain groceries because he thought her purchase of them unnecessary. In 1964, the husband refinanced the mortgage on the parties' home in order to finance the purchase of ten commercial "spots" on local television. The husband used the spots to discuss religious matters and "how to buy a used car." The wife thought they could not afford the spots, but agreed to them because she was afraid that otherwise the husband would scold her.

Throughout the marriage, the husband accused his wife of having committed indiscretions with other men prior to their marriage. The husband would "rant and rave" and "make life miserable" whenever he brought this subject up. On one occasion, he threw a dish at her, and on another occasion, he paddled her. Also, the husband continually "scolded" his wife. He criticized her for being late to church, although she explained that she had to get their three children prepared to go. He did not like her associating with other people. He did not permit her to join the Parent–Teacher Association at the childrens' school.

From 1950 until 1966, the husband was employed by General Electric Company in Erie, Pennsylvania. In March 1966 the husband began a one–man strike against General Electric to force the company to accept a union to which the husband belonged. The husband picketed General Electric for fifteen months, during which time the family had great difficulty meeting its financial obligations. In 1967 the husband ended his strike against General Electric and took the company to court. Unable to get relief, he picketed the court and was jailed for disturbing the peace. He refused to leave the jail, believing his presence there to be an act of legitimate civil disobedience. In October 1967 the wife petitioned the court to have the husband committed to Warren State Hospital, Warren, Pennsylvania. The husband was initially committed for a 48 hour period, later amended to a 30 to 90 day period, and finally, to an indefinite period.

While committed, the husband wrote the wife several letters criticizing her for having a job and accusing her of "abandoning her children," "mother delinquency," "juvenile delinquency," and "inflation." The husband would cite passages from the Bible to the effect that women were "keepers at home" and "the woman's place" was in the home. The husband was permitted brief visits to the parties' home. On one of these, he had a severe argument with the wife about her job and her alleged infidelities. In September 1970 the husband ran away from the Warren State Hospital and fled to New York City. The wife did not see her husband until the master's hearing, almost eight years later.

Between 1970 and 1978, the husband lived in New York City and Washington, D.C. When he first arrived in New York City, he stowed away on a ship, only to be returned to the city. When his wife learned of this, she had him committed to Bellevue Hospital, but after one month, for unknown reasons, he was discharged. He subsequently went to Washington, where he picketed the White House with signs stating, "We Want Wives That Obey," "Sign Here For Husband's Liberation," and "Husband's Suffrage."

The media coverage of this picketing caused the wife considerable embarrassment. In 1974, the husband wrote the wife, proposing reconciliation, but only if she would quit her job. Other similar offers of reconciliation followed. The wife refused all of them, however, because she believed the condition on them was unreasonable.

Many of the master's findings credited the wife's version of the marriage. The husband corroborated her testimony that he had accused her of indiscretions with other men prior to their marriage and that she became visibly upset as a result of these accusations. He also testified that "what she said this morning, is practically all true. I find very little to disagree with." N.T. at 66, April 20, 1978.

Notwithstanding the foregoing, we must remand this case so that the master and lower court may determine, if necessary after additional testimony, whether given the evidence of the husband's disturbed mental condition, he should be held responsible for all the indignities he has committed and his willful desertion.[2]

2. The husband argues that the wife was not an "innocent and injured spouse." He claims that her "nagging of the materialism" originally led him to strike General Electric. There are indications in the record that the wife did want the family's standard of living to improve. This concern, however, did not justify any of the indignities that the husband committed.

The husband also argues that the master and the lower court erred in not appointing a guardian on his behalf, and that the case should be remanded to the lower court for a competency hearing.

Pa.R.Civ.P. 2056(a) states:

(a) If, at any time during the pendency of the action, the court shall find that the plaintiff is an incompetent, who is not represented in the action by a guardian or a guardian ad litem, the court shall either

(1) forthwith appoint a guardian ad litem; or

(2) stay all proceedings and enter an order directing that the plaintiff be represented in the action by a guardian within such reasonable time as the court shall direct. Notice of such order shall be given to such persons and in such manner as the court may direct. If a guardian is not appointed within the specified time, the court shall appoint a guardian ad litem.

Pa.R.Civ.P. 2051 defines an "incompetent" as a person

(a) who has been adjudicated incompetent or

The standard to be applied in making this determination was set forth in *Steinke v. Steinke, supra,* 238 Pa.Super. at 80–81, 357 A.2d at 677, where a majority of this court stated:

It is true that conduct springing from mental ill health cannot constitute indignities because it must be regarded as unintentional and lacking in the spirit of hate and estrangement which is the heart of the charge of indignities. *Barr v. Barr,* [232 Pa.Super. 9, 331 A.2d 774 (1974)]: *Boggs v. Boggs,* 221 Pa.Super. 22, 289 A.2d 479 (1972); *Fawcett v. Fawcett,* 159 Pa.Super. 185, 48 A.2d 23 (1946). " '[This] doctrine must not, however, be pushed to extremes. The guilty spouse cannot excuse . . . mistreatment amounting to indignities by the shallow excuse of nervousness or irritability unfounded in any specific ailment. The law still considers the parties as masters of their own conduct unless legal insanity has intervened . . . or recognizable and definable disease has usurped the will, and the ill–treatment is but the normal manifestation of the derangement of health.' " *Dougherty v. Dougherty,* 235 Pa.Super. 122, 130, 339 A.2d 81, 85 (1975), *quoting,* 2 A.

(b) who, because of infirmities of old age, mental illness, mental deficiency or retardation, physical incapacity, drug addiction or inebriety, is found by the court in the pending action

(1) to be unable to manage his property, or to be liable to dissipate it or become the victim of designing persons, or

(2) to lack sufficient capacity to make or communicate responsible decisions concerning his person or property; "confined" means legally committed or voluntarily or involuntarily restrained because of incompetence.

Although the husband has been hospitalized for mental illness, he has not been adjudicated an "incompetent." This court has held that mere confinement in a mental institution is not tantamount to an adjudication of incompetency. *Ryman's Case,* 139 Pa.Super. 212, 11 A.2d 677 (1939). The lower court and the master could therefore have only appointed a guardian if they believed that the husband "lack[ed] sufficient capacity to make or communicate responsible decisions concerning his person or property." Pa.R.Civ.P. 2051. In a situation such as this, we must defer to the master. The husband appears to have testified lucidly at the master's hearing. Moreover, the husband was represented by an attorney at that hearing. Finally, the husband has argued this appeal *in persona propria.*

On remand, if the lower court finds that the husband is incompetent, it should appoint a guardian pursuant to Pa.R.Civ.P. 2056.

Freedman, *Law of Marriage and Divorce in Pennsylvania*, 700–01 (2d ed. 1957).

In *McElroy v. McElroy*, 185 Pa.Super. 78, 138 A.2d 299 (1958), we reversed a decree of divorce and agreed with the master that in view of the wife's mental condition, her desertion of her husband could not be considered willful and malicious. In *Barr v. Barr, supra,* where the husband, seeking a divorce for indignities, testified that the wife had been admitted to the psychiatric ward of a hospital in Lancaster for three weeks and on four or five occasions was a patient at Fairmount Farms, a private psychiatric hospital in Philadelphia, we reversed a decree of divorce and remanded for further proceedings because despite the husband's testimony, neither the master nor the lower court had made any findings of fact with respect to the wife's mental condition and its possible effect on her conduct. In doing so, we noted that "[i]t is essential that all facts relevant to a divorce be fully explored. *Cortese v. Cortese*, 163 Pa.Super. 553, 556, 63 A.2d 420, 422 (1949); *Bonomo v. Bonomo*, 123 Pa.Super. 451, 454, 187 A. 222, 224 (1936)." 232 Pa.Super. at 14, 331 A.2d at 777.

Here, as in *Barr v. Barr, supra,* there are no findings of fact about the husband's mental health, even though the wife herself testified that the husband had suffered from mental problems during the course of their marriage, and that she had had him committed to the Warren State Hospital in 1967. In this regard, it also appears that on October 10, 1967, the husband was committed to Hamot Hospital for an examination not to exceed 48 hours; on November 17, to Warren State Hospital for not less than thirty days nor more than ninety days; and on January 19, 1968, to Warren State Hospital indefinitely.[3] The latter two orders included findings that the husband was "mentally ill." Furthermore, the wife testified that she had the husband committed to Bellevue Hospital in New York City after he

3. These three orders were terminated as of October 16, 1979. The husband moved to terminate them in anticipation of his personal appearance before this court on November 15, 1979.

unsuccessfully stowed away on a ship, but after one month, for unknown reasons, he was discharged.

In remanding, we intimate no opinion regarding the husband's responsibility for his conduct. We recognize that given that the husband was only hospitalized for a relatively short portion of the parties' marriage, the master and lower court may find that he committed indignities independent of any mental disturbance, and that he had the requisite intent to desert his wife when he left this state in 1970. However, the findings may be otherwise. In any case, the findings should have been made originally; without them we cannot in "good conscience" decide this case.[4] *Barr v. Barr, supra,* 232 Pa.Super. at 9, 331 A.2d at 774.

Reversed and remanded for proceedings consistent with this opinion.

4. If the lower court once again decides that the wife is entitled to a divorce, it may wish to consider the possible applicability of 23 P.S. § 48 (Purdon's Supp. 1979–1980), which provides:

In case of the application of a spouse for divorce from a spouse who is insane or suffering from serious mental disorder, the court, or a judge thereof to whom the application is made, shall have the power before granting the divorce to decree an allowance for the support of the defendant spouse in such amount as it may direct. The allowance herein provided may be subsequently adjusted to conform to changed conditions.