421 A.2d 1139

**Richard G. GROSS, Appellant,**

v.

**Helen A. GROSS.**

Superior Court of Pennsylvania.

Argued April 16, 1980.

Filed Aug. 22, 1980.

46

Edgar J. Cooke, Bellevue, for appellant.

Robert A. Banks, Ambridge, for appellee.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

This is an appeal from an order denying appellant–husband a divorce based upon indignities to the person.[1]

On July 11, 1977, the husband filed a complaint for a divorce, alleging indignities. On October 17, he filed an amended complaint that alleged desertion in addition to indignities. The lower court appointed a master, who held a hearing on July 28, 1978. On May 14, 1979, the master filed a report recommending that the husband be granted a divorce on the grounds of indignities. On September 4, the lower court sustained the wife's exceptions to the master's report and denied the husband a divorce. He has now brought this appeal.

In *Keller v. Keller*, 275 Pa.Super. 573, 419 A.2d 49 (1980), this court stated:

> On an appeal from a divorce decree, we are obliged to make an independent review of the record. *Barr v. Barr*, 232 Pa.Super. 9, 331 A.2d 774 (1974); *Nacrelli v. Nacrelli*, 288 Pa. 1, 136 A. 228 (1927). However, "[a] report of a master who has had the advantage of seeing and hearing the parties and their witnesses, is, nevertheless, to be given fullest consideration." *Vautier v. Vautier*, 138 Pa. Super. 366, 367, 11 A.2d 207, 208 (1939). *See also Lyons v. Lyons*, 116 Pa.Super. 385, 176 A. 792 (1935).

1. *See* Act of May 2, 1929, P.L. 1237, § 10 *as amended*, 23 P.S. § 10 (Purdon's 1955) (repealed 1980). The new divorce code, which became effective July 1, 1980, specifically states that its provisions "shall not affect any suit or action pending, but the same may be proceeded with and concluded either under the laws in existence when such suit or action was instituted, notwithstanding the repeal of such laws by this act, or, upon application granted, under the provisions of this act." Since the parties have not sought to have the new law applied, we decide this case under the law existing at the time the complaint was filed, that is, the Act of 1929 as amended by the Act of March 19, 1943, P.L. 21, § 1.

To make out a charge of indignities, three elements must be proved: (1) a course of conduct that, although varying according to the circumstances of each case, must in every case (2) be inconsistent with the marital relationship, and (3) render the condition of the innocent party intolerable and his or her life burdensome. *Steinke v. Steinke*, 238 Pa.Super. 74, 85–87, 357 A.2d 674, 680–81 (1976) (SPAETH, J., concurring) (collecting cases). Although. no general rule can be formulated as to what constitutes indignities in a particular case, the matter being one that depends upon all the circumstances of the particular case and the position in life, character, and disposition of the parties, *Margolis v. Margolis*, 201 Pa.Super. 129, 133, 192 A.2d 228, 230 (1963), our cases hold that proof of "vulgarities, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, or malignant ridicule" may be sufficient to make out a case for divorce based on indignities. *Barton v. Barton*, 248 Pa.Super. 278, 283, 375 A.2d 96, 98 (1977). *See also Bristol v. Baranyi*, 259 Pa.Super. 418, 393 A.2d 897 (1978). Moreover, several of these factors "may coalesce to justify a finding of indignities, although taken separately, no single incident. or factor would be sufficient." *Barton v. Barton, supra* [248 Pa.Super.] at 283, 375 A.3d at 98. Finally, it should be noted that the burden of proving indignities was on the husband as the party seeking the divorce, *Mintz v. Mintz*, 258 Pa.Super. 187, 392 A.2d 747 (1978); *Taddigs v. Taddigs*, 200 Pa.Super. 29, 186 A.2d 455 (1962), and that the husband was required to prove that he was an innocent and injured spouse, *Mintz v. Mintz, supra.*

Among the master's findings were the following. The parties were married on July 20, 1957, in Ambridge, Pennsylvania, and have two children, twin girls, Joyce and Janet, born on April 25, 1962. The marriage was troubled from the outset. The parties lived with the wife's father and her daughter from an earlier marriage. When the parties moved into a new home in 1963, the wife and her father

excluded the husband from decision–making about household repairs. The wife had a "foul" mouth; she would commonly curse the husband in Croatian and call him a "no good Nazi bastard." The wife complained that the husband did not earn enough money as a mill worker and continued to complain even when he took part–time jobs as a mover, and later as a bartender. The parties had practically no sexual relations because the wife was continually afraid of getting pregnant. The wife offered no love and affection to her husband generally. When the parties' children were born, the wife called her husband "a dirty son of a bitch" for getting her pregnant and he shouldered most of the responsibility for taking care of the children. In 1964, the husband was offered a better paying job that would have involved a great deal of travel. His wife and her father objected to his taking the job, and the wife accused him of having another woman, which was not true. In 1965 or 1966, the wife befriended one George Markley, with whom she bowled on Saturday nights. After she introduced Markley to her husband, she announced to him that she and her father had decided to allow Markley to move into the house as a boarder. Although the husband liked Markley personally, he did not want a boarder in the house. In spite of the husband's objections, the wife and her father bought a bed for Markley and moved him into the house. The husband began to have suspicions that the wife was having an affair with Markley because he would drive home for lunch with the wife, even though the parties' home was 22 miles away from his job. The husband's suspicions were never confirmed, but in August 1966, about a month or so after Markley moved into the house, the wife hired an attorney who prepared a separation agreement and various papers transferring property to the wife. The husband signed the papers and moved out of the house five days later. After the parties separated, the husband began dating one Gloria Stefano, with whom he presently lives. In 1967, the parties reconciled and the husband moved back into the house. However, the relationship was no better than it had been previously and the husband left again in January 1968. A

second reconciliation occurred in March 1969, but the husband moved out again in June of that year after he saw his wife with another man. The parties have not lived together since then. While the parties were still living together, the husband got intoxicated a number of times, sometimes as a result of arguments with his wife. However, the husband did not miss any work, cause any damage to the house or property, or physically abuse his wife as a result of his drinking.

In denying the husband a divorce, the lower court stated that "(1) He became drunk on a number of occasions. (2) He came home at all hours of the night and stayed out all night on many occasions. (3) He carried on an affair with one Gloria Stefano." Slip op. at 2. After examining the master's findings in the context of the entire record, as we have independently reviewed it, we have concluded that the lower court did not give sufficient weight to the fact that the master found the husband's testimony credible and supported by other facts in the record, and the wife's testimony "simply not convincing." Where the credibility of a witness is concerned, the findings of the master should be given the "fullest consideration." *Mintz v. Mintz, supra,* 258 Pa.Super. at 190, 392 A.2d at 749. The husband's testimony was that he was drunk on a number of occasions before the parties finally separated, but that he did not miss any work, cause any damage to the parties' house, or physically abuse his wife as a result of his drinking, N.T. at 53–54; that he stayed out late and returned in a drunken condition on several occasions only after the parties initially separated; and that he stayed out all night only a couple of times. N.T. at 33. In order for a husband to be an "innocent and injured spouse" he need not be "wholly free from fault." *O'Leary v. O'Leary,* 264 Pa.Super. 253, 399 A.2d 763 (1979); *Ryave v. Ryave,* 249 Pa.Super. 78, 375 A.2d 766 (1977). Here, the instances where the husband drank too much or stayed out all night were minor in relation to the wife's continual "vulgarities, ... studied neglect, intentional incivility, manifest disdain, abusive language, [and] malignant

ridicule" of her husband. *Barton v. Barton, supra,* 248 Pa.Super. at 283, 375 A.2d at 98. Finally, the husband testified that he only began seeing Gloria Stefano after he was initially separated from his wife. By that time his wife had already committed indignities that would justify a divorce, and any acts of adultery on the part of the husband that occurred thereafter would not change his status as an "innocent and injured spouse." *Ryave v. Ryave, supra,* 249 Pa.Super. at 85, 375 A.2d at 769.

Order of the lower court vacated. Appellant is granted a divorce based on indignities.