448 A.2d 64

**John L. RORABAUGH, Appellant,**

v.

**Mary Elizabeth RORABAUGH a/k/a Betty B. Rorabaugh.**

Superior Court of Pennsylvania.

Argued June 14, 1979.

Filed July 9, 1982.

1

2

Louise G. Herr, Lancaster, for appellant.

John W. Burge, Lancaster, for appellee.

Before SPAETH, STRANAHAN and SUGERMAN, JJ.*

SUGERMAN, Judge:

Appellant, ("Husband") appeals from an order of the lower court sustaining Appellee's ("Wife") exceptions to the report of a Master in Divorce and denying Appellant a Decree in Divorce upon the ground of indignities to the person.[1] The Master recommended in her report that a Decree of Divorce be granted the husband, but the lower· court refused to adopt such recommendation upon finding that husband was not an injured and innocent spouse by reason of indignities committed by him.

Husband contends on appeal that the lower court erred in failing to accord appropriate weight to the findings of the Master with regard to the credibility of the witnesses who appeared before the Master.

Before we address Husband's contention, we reiterate our scope of review, and as we stated in *Brown v. Brown*, 288 Pa.Super 354, 356, 431 A.2d 1085, 1086 (1981), (*quoting from Schrock v. Schrock*, 241 Pa.Super. 53, 57–8, 359 A.2d 435, 437–8 (1976)):

" '. . . we must initially note that it is our duty, on appeal, to make an independent study of the record and to determine whether a legal cause of action for divorce exists. *Barr v. Barr*, 232 Pa.Super. 9, 331 A.2d 774 (1974); *Arcure v. Arcure*, 219 Pa.Super. 415, 281 A.2d 694 (1971). Moreover, while the master's findings of fact and recommendation that a divorce be granted are only advisory, where the issue is one of credibility and the master is the one who heard and observed the witness, his findings should be given the fullest consideration. *Gehris v. Gehris*, 233

* Pres. Judge JOHN Q. STRANAHAN, of the Court of Common Pleas of Mercer County, Pennsylvania and Judge LEONARD SUGERMAN, of the Court of Common Pleas of Chester County, Pennsylvania, are sitting by designation.

1. Act of May 2, 1929, P.L. 1237, § 10, as amended by the Act of March 19, 1943, P.L. 21, § 1, 23 P.S. § 10(f) (Repealed by the Act of April 2, 1980, P.L. 63, No. 26, §§ 101 et seq., 23 Pa.C.S.A. §§ 101 et seq.)

Pa.Super. 144, 334 A.2d 753 (1975); *Sells v. Sells,* 228 Pa.Super. 331, 323 A.2d 20 (1974).' "

*And see, Gross v. Gross,* 281 Pa.Super. 45, 47, 421 A.2d 1139, 1140 (1980) (*quoting from Keller v. Keller,* 275 Pa.Super. 573, 419 A.2d 49 (1980)); *Britton v. Britton,* 280 Pa.Super. 87, 421 A.2d 417 (1980).

■ As the lower court found that Husband committed indignities as well, we should also again observe that no general rule can be formulated as to the precise nature of the conduct that will constitute indignities to the person in a given case, as such conclusion will depend upon the circumstances of that particular case. *Brown v. Brown, supra,* 288 Pa.Super. at 356–7, 431 A.2d at 1086 (*quoting from Schrock v. Schrock, supra,* 241 Pa.Super. at 58, 359 A.2d at 437–8, which in turn *quoted from Sells v. Sells,* 228 Pa.Super. 331, 333–34, 323 A.2d 20, 22 (1974)); *Shuda v. Shuda,* 283 Pa.Super. 253, 423 A.2d 1242 (1980); *Keller v. Keller, supra; Rollman v. Rollman,* 280 Pa.Super. 344, 421 A.2d 755 (1980).

As no strict test thus applies, the Supreme Court has delineated a framework of conduct within which we may determine whether indignities are present:

" 'Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement' " *McKrell v. McKrell,* 352 Pa. 173, 180, 42 A.2d 609, 612 (1945) (*quoting from Evans v. Evans,* 152 Pa.Super. 257, 262, 31 A.2d 590, 592 (1943)).

The *McKrell* court also said:

"The essential feature of the offense of indignities to the person is that it must consist of a course of conduct or continued treatment which renders the condition of the innocent party intolerable and his or her life burdensome ... [citations omitted] ... What is meant by such indignities is left undefined in the law, and depends largely upon the circumstances of each case; they must consist of such a course of conduct as is humiliating, degrading and inconsistent with the position and relation as a spouse

. . ." *McKrell v. McKrell, supra,* 352 Pa. at 180, 42 A.2d at 612.

■ In addition to proving indignities, however, the moving party must also prove that he or she is the injured and innocent spouse. 23 P.S. § 10(f); *Liebendorfer v. Liebendorfer,* 289 Pa.Super. 339, 341, 433 A.2d 480, 481 (1981); *Brown v. Brown, supra,* 288 Pa.Superior at 357, 431 A.2d at 1087; *Gross v. Gross, supra,* 288 Pa.Super. at 48, 421 A.2d at 1140 (*quoting from Keller v. Keller, supra,* 275 Pa.Superior at 576–7, 419 A.2d at 51); *Rollman v. Rollman, supra,* 280 Pa.Super. at 349, 421 A.2d at 757; *Dukmen v. Dukmen,* 278 Pa.Super. 530, 534, 420 A.2d 667, 670 (1980); *Moorhead v. Moorhead,* 278 Pa.Super. 275, 278, 420 A.2d 537, 539 (1980); *Mintz v. Mintz,* 258 Pa.Super. 187, 193, 392 A.2d 747, 750 (1978). Thus it has been said that a finding that the moving party is the innocent and injured spouse "is a prerequisite for entitlement to a divorce based upon the grounds of indignities". *Brown v. Brown, supra,* 288 Pa.Super. at 357, 431 A.2d at 1087.

With these familiar principles in mind, then, and within our broad scope of review, we examine the record to determine whether Husband proved that he is an innocent and injured spouse. We must also note that we are assisted in our task by a comprehensive and scholarly opinion filed pursuant to Pa.R.A.P. 1925(a) by Judge Eckman of the Court below.

From the record of the hearing before the Master, it appears that the parties were married on October 5, 1946, and eight children resulted from the union. At the hearing, Husband, then 59 years of age, testified that he was a biology teacher by profession, and held the position of professor of biology at Millersville State College during the seventeen years immediately preceding the hearing. (R–7a). When examined upon the subject of indignities committed by Wife during the approximately 28 years of cohabitation, Husband testified that on one occasion in 1973, she removed all his clothing from the parties' farm house and put them in his pickup truck parked at the College, and when he unloaded the clothes at home, the Wife again

placed them in the truck (R–10a–11a, 54a); that Wife never encouraged Husband in his endeavor to improve the parties' farm, never encouraged the children to work on the farm, and once did not permit their 8-year old son to assist Husband in planting corn (R–14a, 31a, 50a–51a); that on two occasions, the last of these occurring in 1976, Wife scratched Husband (R–18a–19a); that once, Wife told Husband several times that she would kill him (R–21a, 52a–53a); that on one occasion upon Husband's return from an auction, Wife struck him (R–52a–53a); that Wife never encouraged Husband in his work as a teacher (R–30a); and that once, within a few months of the hearing, during the course of an argument, Wife tore Husband's glasses off, and slammed them to the floor, bruising Husband's ear as she did (R–34a–35a). Husband presented no other witnesses or evidence in his case in chief.

At the hearing, Wife, then 51 years of age, testified that the parties' marriage began to disintegrate approximately ten years prior to the hearing when Husband became violent (R–67a); that on one occasion, Husband savagely kicked Wife at the base of her spine, resulting in her inability to assume a sitting position without a pillow for two days (R–67a–68a)[2]; that Husband's violent conduct toward Wife and the children continued during the ten-year period and increased in intensity "almost . . . beyond bearing" (R–68a–69a); that Husband's acts of violence toward Wife and the children were too numerous to enumerate (R–69a); that Husband once struck the parties' 6-year old son and their oldest daughter in the face for no apparent reason, causing both to bleed (R–70a–71a); that Husband constantly "screamed" at Wife and the children (R–71a); that the violence ceased only at or about the time Husband filed the instant complaint in divorce (R–71a); that Husband continually associated with his young, female laboratory assistant; that when Husband traveled to the South Pacific on sabbati-

2. When asked by Wife's counsel during cross examination whether this incident occurred, Husband responded, incredibly, that he was not aware of it as Wife "would not say anything to him" (R–35a–36a).

cal leave for a period of one year, he gave Wife only $1800.00 for the support of Wife and the children, forcing Wife to seek charity from the parties' church (R–77a–78a) [3]; that approximately one year prior to the hearing, Husband refused to pay the telephone bill, resulting in a cessation of telephone service for a period of six months (R–85a); that when the children invited friends to the parties' home, Husband forced such friends to work and otherwise intentionally embarrassed them, and as a result, the children were unable to invite friends to the home (R–100a); that early in the marriage, Husband on several occasions pulled Wife down a flight of stairs by her hair and clothing (R–103a); that in May, 1973, Husband for no apparent reason, chased Wife down a road with a wooden board (R–107a–108a); that Wife intercepted love letters written to Husband by a woman whom Husband met while on sabbatical leave (R-115a); and that Wife placed Husband's clothing in his truck as the result of his constant association with his young laboratory assistant (R–110a–111a).

The parties' son John, Jr., twenty-nine years of age at the time of the hearing, testified on behalf of Wife that Husband has beaten and slapped Wife and pulled her hair "since I have a memory" (R–113a–129a); when asked how frequently Husband beat Wife, John, Jr. responded:

"A. I would say more than a hundred, probably in the thousands, I would say there have been months on end when it was a daily occurrence." (R–131a–132a, 150a); that Husband beat John, Jr. and on occasion struck him with a board, once breaking John, Jr's. nose, (R–134a); that Husband dragged John, Jr. to his automobile and intentionally closed the door before John, Jr. could remove his hand, breaking a finger (R–134a–135a, 154a); that Husband beat John, Jr. with a baseball bat (R–138a); that Husband continually beat the parties' daughter Barbara, and on one occasion, broke down her bedroom door and pulled her by the hair (R–137a); that once when John, Jr. brought a friend home, Husband beat John, Jr. and screamed at him in

3. At the time, Husband's salary was $20,000.00 annually, (R–77a)

the presence of the friend, severely embarrassing John, Jr. and causing him to refuse to bring friends to the home ever again (R–141a–142a); and that Husband constantly hurled invectives and obscenities at Wife (R–143a).

The parties' daughter Barbara, 25 years of age at the time of the hearing, also appeared as a witness on behalf of Wife and testified that Husband struck, slapped and beat Wife every weekend and at least two or three times during the week for years (R–186a–188a); and that she has seen Wife endeavoring to defend herself against Husband's assaults with a frying pan (R–185a). Barbara confirmed John, Jr's. account of the beatings administered to him by Husband (R–188a–189a), and testified that Husband's violent behavior was unprovoked (R–187a–188a).

Robert Knappman, married to the parties' oldest daughter Annetta, also appeared on behalf of Wife and testified that Husband attempted to strike him, and that he observed bruises upon Annetta (R–177a–179a).

Finally, in rebuttal, Husband called his brother as a witness, who testified that he visited the family frequently and never observed Husband physically abuse Wife or the children (R–217a–218a).

The Master, in her report, recounts the testimony in detail, and though she does not directly assess the credibility of either Husband or Wife, does say that:

"In evaluating the credibility of the witnesses, the Master feels that Plaintiff's testimony has established by preponderance of the evidence that the defendant has committed such indignities as are required under the Statute and that defendant's actions were not sufficiently provoked by Plaintiff so as to disallow a granting of a divorce on the grounds that Plaintiff is not the injured and innocent spouse. Defendant herself stated that although Plaintiff may have hit her, he never did so without a reason [4] and, in fact, defendant did not find the physical

4. This conclusion by the Master is apparently based upon the following testimony by Wife during direct examination:
   "Q   Has he ever struck you?

nature of the family's relationship objectionable but was most upset by which she believed to be examples of Plaintiff infidelity . . . " (R–248a–249a)

and further

"A case of this nature presents an extremely difficult problem for the Master in evaluating credibility of witnesses and the wait to be afforded in their testimony. However, after having considered all the evidence and the testimony produced, the Master finds that the Plaintiff has established by preponderance of the evidence that defendant has exhibited an attitude of hate and estrangement toward Plaintiff, that such attitude through its continued course of conduct has rendered Plaintiff's condition intolerable and life burdensome, and that Plaintiff is the injured and innocent spouse . . . " (R–249a–250a)

As the lower court points out in its opinion:

"The Master did not explicitly find that the Plaintiff was more credible then the Defendant and her corroborating witnesses. In fact, the report does not address credibility per se, as it relates to the contradictory testimony. It appears from the report that the Master's final recommendation was based on interpretations of the record, rather then on a disbelief of the testimony offered by the Defendant and her witnesses. Nowhere does the Master offer an explanation of the demeanor of the witnesses. In fact, it appears from a total reading of the report that the

A   Yes, it's in a provoked manner, he always has some reason.
Q   What reason?
A   If I would say something or even if I didn't lots of times I didn't say anything that was just as bad as if I did.
Q   Would you say that you encouraged [Husband] to strike you or give him reason to strike you?
A   No, because I would run away and he would come after me, but I would run away. I don't think that's encouraging it." (R–84a–85a)

It is at once obvious that the Master has misread the record. It is also apparent that the Master has misperceived the substance of Wife's testimony. If there can ever be "reasons" justifying a physical attack by one spouse upon the other, silence is surely not among them.

Master accepted as fact that there was violence in the home." (A–5)

The lower court also carefully considered the Master's finding that Wife excused the violent behavior of her Husband:

"The Master's finding that Defendant excused Plaintiff's behavior is somewhat curious in light of Defendant's statement that at one point the violence reached a point beyond bearing. Defendant did testify that she continually forgave her husband for the violent episodes, but that they kept recurring. When asked about other marital problems, she stated ... 'well I guess you learn to live with those things like the insulting, and the beatings, but when something comes along like other woman, then you tend to wonder about a marriage'. In light of Defendant's other testimony that she tried to keep things hidden from friends to prevent any belittling of the reputation of the family ... though it is possible that she has grown accustom to Plaintiff's behavior, we can not conclude that this excuse his conduct."

The lower court then found Husband's testimony to have been "shaken" and concluded that Husband initiated the episodes of violence and committed indignities toward Wife at least as grievous as those committed by Wife. As a result, the lower court found that Husband was not an innocent and injured spouse.

Husband argues that the Master, by finding Husband to be an innocent and injured spouse, impliedly resolved the issue of credibility in favor of Husband, and as the case at bar was at best a "swearing contest"[5], both the lower court and this court must accord the Master's conclusions "the greatest weight". Appellant's Brief at 9.

■ The case is, first of all clearly *not* a "swearing contest", as Wife's testimony was in large part corroborated by the testimony of the parties' children, while Husband was

5. Husband labels the case one of "competitive truthfulness". Appellant's Brief at 9.

essentially the only witness in his case.[6] More significantly, however, while it is of course quite correct to observe, as does Husband, that where the issue is one of credibility and the Master is the one who heard the testimony and observed the demeanor and appearance of the witnesses, a reviewing court must give the Master's findings regarding credibility the fullest consideration, *Rollman v. Rollman, supra; Schrock v. Schrock, supra,* at the same time, we have said that the issue of credibility is not *entirely* to be resolved by the Master, and a reviewing court has the duty to make a complete and independent review of all the evidence, including a review of the weight and credibility to be accorded to the testimony of the witnesses. *Rollman v. Rollman, supra; Keller v. Keller, supra (quoted in Britton v. Britton, supra).*

At bar, the lower court conducted precisely the kind of review we have envisioned and found the testimony of Wife not only corroborated by the testimony of parties' two children, but inherently more credible than that of Husband as well. The opinion of the lower court also takes issue with a number of the Master's conclusions, as, for example, the conclusion that violence was accepted in the parties' home as "normal", and the unsupported finding by the Master that Wife provoked Husband's physical attacks.

We have reviewed the record most carefully and agree with the lower court that such record makes abundantly and manifestly clear that Husband was neither injured nor innocent,[7] *Moorhead v. Moorhead, supra,* 278 Pa. Super. at 279–83, 420 A.2d at 541–542, and that Husband committed indignities toward Wife at least as grievous as

---

**6.** Examples of "swearing contests" are found in *Boniewicz v. Boniewicz,* 266 Pa.Super. 210, 403 A.2d 999 (1979); *Leucci v. Leucci,* 261 Pa.Super. 107, 395 A.2d 1333 (1978); *Hargrove v. Hargrove,* 252 Pa.Super. 120, 381 A.2d 143 (1977).

**7.** As one of many examples, the Master did not discredit the testimony of John, Jr., who, it will be recalled testified that Husband physically abused him repeatedly. We have said in the past that if a spouse abuses the parties' children a court may find that such spouse is not the innocent and injured party and that such conduct constitutes an indignity to the other spouse. *McCaskey v. McCaskey,* 253 Pa.Super. 360, 368–69, 385 A.2d 378, 383 (1978).

those committed by her. Our independent review of the record also convinces us that the Master's contrary conclusions are wholly unsupported.

Although a plaintiff, as Husband, need not be entirely free from fault to be an innocent and injured spouse, *Liebendorfer v. Liebendorfer, supra; Gross v. Gross, supra; Rollman v. Rollman, supra; Moorhead v. Moorhead, supra,* it is apparent instantly that "[H]usband's derelictions were not a minor or passing phenomenon, but went to the very heart of the cause which brought about the marital difficulties." *Liebendorfer v. Liebendorfer, supra,* 289 Pa.Super. at 343, 433 A.2d at 482. The lower court thus properly found that Husband was not an innocent and injured spouse and correctly dismissed his complaint.

Affirmed.